BEIER v. ST. LOUIS TRANSIT COMPANY, Appellant.

Division One, June 19, 1906.

1. **NEGLIGENCE: Street Car: Wagon on Track: Demurrer.** The street was a built-up embankment, with a narrow wagon way on each side the railway tracks. Down this street was moving a procession of six loaded and wide manure wagons, scattered along for 200 feet approaching a bridge, where the embankment narrowed. The inside wheels of the second wagon from the front were inside the track. The car ran down grade for 600 feet, in full day, with no obstruction to the motorman's vision, and struck the second wagon, pushed it ahead against the first, which was being driven by plaintiff and which was outside the rails, toppling it over the embankment, and injuring plaintiff. There was evidence that the second wagon was straddling the rail for 100 to 150 feet before it was struck. *Held,* that it was the motorman's duty to have kept a vigilant watch and to have put his car under control, and there being ample evidence that he was negligent in those respects, no demurrer to plaintiff's case should have been given.

2. **NEGLIGENT SPEED.** Speed may be negligent under critical circumstances and yet be ordinary speed or less.

3. ———: **Unlawful.** Speed may be negligent and yet be less than the maximum rate permitted by ordinance.

4. ———: **Crowded Street: Prudence.** A prudent motorman will not permit a street car to plunge through a procession of heavily loaded wagons on a high embankment and over a bridge with one of them straddling the track.

5. ———: ———: **Rate Not Proved in Miles.** Where the evi-dence is that the car was going fast, although only one witness attempted to fix the speed in miles per hour, the court will not hold that there was no evidence that the car was going at a negligent rate of speed.

6. ———: **Proof of Time in Which Car Can Be Stopped.** Where the conductor testified that the car was stopped in its own length plus eight or ten feet, and there was evidence that the wagon struck straddled the rail in front of the car for 100 or 150 feet before it was struck, there was no need to encumber the case with expert testimony of the distance a like car under like circumstances could have been stopped.

7. **NEGLIGENCE: General: Ringing Bell: Speed: Instruction.** The petition in one paragraph charged the defendant with so "negligently and unskillfully operating its car that it suddenly and with great force ran into a wagon" then being driven on the track and forced it against plaintiff's wagon, etc. Another paragraph charged failure to ring the bell, to keep the car un-der control, and negligent speed. *Held*, that an instruction for plaintiff, which ignores the rate of speed and the ringing of the bell, and put the case to the jury on broad lines of negligence, was not out of harmony with the petition and the facts in judgment.

8. **EVIDENCE: Former Statement: Contradicted and Rejected.** Although a witness previously made and signed a written statement and at the trial gave in contradictory evidence, and was confronted with such prior statement and cross-examined by the party offering him in regard thereto, it is no abuse of the court's sound judicial discretion to refuse to admit that written *ex parte* statement in evidence, even though he had been subpoenaed by both sides, if there is nothing to show that the party offering him had been entrapped or surprised or tricked.

Appeal from St. Louis City Circuit Court.—*Hon. Rob-ert M. Foster,* Judge.

AFFIRMED.

*Glendy B. Arnold* for appellant; *Boyle & Priest* and *George W. Easley* of counsel.

(1) A verdict will not be allowed to stand which rests upon a charge of negligence not sustained by the

evidence.   Dowell v. Guthrie, 99 Mo. 662; Murray v. Railroad, 101 Mo. 240; O'Malley v. Railroad, 113 Mo. 325; Pueschell v. Wire Works, 79 Mo. App. 464; Markowitz v. Railroad, 186 Mo. 350; Engleking v. Railroad, 187 Mo. 164; Zumault v. Railroad, 175 Mo. 288; Cicardi v. Railroad, 108 Mo. App. 462.   There must be evidence to show that the car could have been stopped after the danger of a collision became apparent.   Zurfluh v. Railroad, 46 Mo. App. 642; Roenfeldt v. Railroad, 180 Mo. 554; Reno v. Railroad, 180 Mo. 469; Engleking v. Railroad, 187 Mo. 165; Theobald v. Railroad, 191 Mo. 395; McGauley v. Railroad, 179 Mo. 583.   In this case there is no certain testimony of persons qualified to speak as to the rate of speed of the car.   Theobald v. Railroad, supra; Helm v. Railroad, 185 Mo. 212.   The collision raised no presumption of negligence against defendant.   Grocer Co. v. Railroad, 89 Mo. App. 541. (2)   The court erred in giving plaintiff's first instruction.   This instruction presents an issue not made by the averments.   "It is the duty of the court, by its instructions, to confine the jury to the consideration of the specific grounds of negligence alleged in the petition, and not by its instruction to widen the issue so as to allow a recovery on a negligent act not set up in the declaration."  Heinzle v. Railroad, 182 Mo. 528; Schlereth v. Railroad, 96 Mo. 509; Wilburn v. Railroad, 26 Mo. App. 203; Jacquin v. Railroad, 57 Mo. App. 320. (3)  The court erred in refusing to permit defendant to introduce in evidence the written statements of Strolle and Meuser.   Clancy v. Railroad, 192 Mo. 615.  (4) The court erred in permitting witness Tiemann to relate part of the conversation between him and defendant's motorman after the collision.

*Fred A. Wind* and *Adolph R. Grund* for respondent.

(1)  (a) Plaintiff's instruction is based on the negligence charged in the petition. Schafstette v. Railroad,

175 Mo. 154; Klockenbrink v. Railroad, 172 Mo. 690; Dezel v. Railroad, 101 Mo. App. 56. (b) If it were otherwise appellant would not be heard to complain, because it adopted the same theory in instructions given at defendant's request. Iron Mt. Bk. v. Armstrong, 92 Mo. 279; Phelps v. City of Salisbury, 161 Mo. 14. (2) Speed may be reckless, although less than that permitted by ordinance. Nier v. Railroad, 12 Mo. App. 35; Holden v. Railroad, 177 Mo. 471; Heinzle v. Railroad, 182 Mo. 555; Jett v. Railroad, 178 Mo. 673; Schafstette v. Railroad, 175 Mo. 154; Klockenbrink v. Railroad, 172 Mo. 690. (3) (a) It was unnecessary to offer any direct evidence within what distance a car could be stopped. Ryan v. Railroad, 100 Mo. 233; Sweeney v. Railroad, 150 Mo. 397. (b) But the testimony of motorman and conductor showed the car could be stopped in eight to twelve feet on slippery track. (4) It was not error to exclude statements offered by way of impeachment. There was no evidence that any artifice was used to induce defendant to use the witnesses. Feary v. O'Neill, 149 Mo. 473. (a) The testimony of Stolle was merely corroborative of the testimony given for plaintiff, and the mere fact that defendant offered the witness did not lend more weight to his testimony. (b) The testimony of Meuser certainly could do no harm to the defendant; and the fact that it did not help defendant certainly did not entitle defendant to present a voluntary unsworn statement as evidence in its behalf, after its truth had been repudiated. (c) The full effect of the statements was obtained by asking witnesses if they had not made certain statements in writing, and by the instructions given for defendant. (5) The case having been submitted on theories presented by defendant, and the verdict being sustained by substantial evidence, this court will not weigh the evidence. Tucker v. Railroad, 54 Mo. 177; Williams v. Railroad, 109 Mo. 475; Bray v. Kemp, 113 Mo. 554; State v. Richardson, 117 Mo. 590; Weller v. Wagner,

181 Mo. 159; Metley v. Hill, 155 Mo. 256; Irwin v. Woodman, 104 Mo. 407; Bureu v. Railroad, 104 Mo. App. 224.    (6) The verdict and judgment are for the right party and should be upheld.   McGrew v. Nugent, 105 Mo. 161; Boggess v. Railroad, 118 Mo. 328; Williams v. Mitchell, 112 Mo. 315; Jones v. Jones, 131 Mo. 194; Schafstette v. Railroad, 175 Mo. 154; Winters v. Railroad, 99 Mo. 518; Klockenbrink v. Railroad, 172 Mo. 690.

LAMM, J.—On December 23, 1903, plaintiff recovered judgment for $9,000 in an action for damages sounding in tort, and defendant prosecuted its appeal, raising no question on the amount of damages, but assigning for error the giving of instructions for plaintiff, the refusal of its own peremptory instruction and the exclusion and admission of testimony.

Plaintiff was injured and his wagon and harness destroyed on the 21st of December, 1901, toward high twelve of that day, by the alleged negligence of defendant, a street railway company, and the charging part of his petition, in one paragraph, is as follows:

"Plaintiff further states that defendant ran a part of its cars upon tracks laid on Gravois Road, which was at the times hereinafter stated, a public highway in the city of St. Louis, Missouri; that while plaintiff was driving in a westerly direction along said Gravois Road in the city of St. Louis, on the north side thereof, outside of and beyond the tracks of defendant, the motorman in charge of a car of said defendant, to-wit, Cherokee, No. 74, so negligently, carelessly and unskillfully operated said car that it suddenly and with great force ran into a wagon then being driven in a westerly direction along the northern side of said Gravois Road in the city of St. Louis immediately in rear of the wagon which the plaintiff was driving, as aforesaid, thereby forcing said last-named wagon and team attached thereto, upon the wagon and team of the plaintiff, and the said team and wagon of the plaintiff was

thereby caused to be driven over the embankment on the north side of Gravois Road; his wagon with his load of manure was upset, the plaintiff falling underneath same, and being seriously injured.''

In other paragraphs, it is charged as follows:

''Plaintiff further states that it is the duty of the defendant to have its motorman, operating cars in the city of St. Louis, to carefully observe the highway upon which the car is being operated and to keep said car under such control as will enable the motorman from colliding with persons or vehicles passing along the highway, and to warn persons upon the highway, who are in danger of being run over or into, of the approach of the car, in time to prevent a collision.

''Plaintiff further states that when said car started from or near the top of the hill on Gravois Road, on, to-wit, December 21st, between the hours of 11 a. m. and noon, to go in a westerly direction, there were a number of teams being driven in the same direction along the north side of said road immediately adjoining the tracks upon which said car was running, and the motorman knew, or by the exercise of ordinary skill and care would have known that said wagon or the loads thereon were liable to come in contact with a car attempting to pass said wagons, and particularly as they approached and were upon said bridge, and it was the duty of the motorman in charge of said car to go slowly down said incline, keep his car under full control so as to enable him to stop within a few feet should necessity require, and to notify each person of the car's approach by ring of bell, in time to prevent such person driving upon or near the car track, and enable persons to escape from danger.

''Plaintiff further states that the motorman in charge of the car aforesaid neglected his duties, and negligently and carelessly and unskillfully permitted said car to move rapidly, failed to keep such car under such control as would enable him to bring said car to-a

sudden stop within a short space, and failed to so ring his bell as to notify one Ebert who was sitting upon a load of manure and driving upon the northern side of said Gravois Road in a westerly direction, of the car's approach in time to enable said Ebert to escape from danger and avoid a collision, and said mortorman in charge of said car unskillfully, carelessly and negliently ran said car, or permitted said car to be run,violently and with great force against the wagon and team in charge of said Ebert, forced said wagon and team to move suddenly and rapidly along said road immediately in front of said car, and against the wagon and team in charge of plaintiff, which was immediately before said Ebert, with such violence that the plaintiff's team and wagon were forced over the embankment, the wagon upset with the plaintiff thereon, the wagon and harness broken and the plaintiff severely and permanently injured.''

The answer was a general denial.

There was a sharp conflict on facts relating to the happening itself, but none on the environment—the physical characteristics of the *locus*—and, as said, the extent of the injuries to plaintiff stands confessed—the evidence tending to show he was crushed and permanently crippled. A description of the place and an understanding of the general facts are essential on the question of the degree of care due to travelers on that highway at that spot and that time; and attending thereto, it is agreed on all sides to be as follows:

Gravois Road is a macadamized thoroughfare in St. Louis, running east and west, on which are laid two tracks of defendant, the north track for west-bound cars, the south track for east-bound cars. On a hill on Gravois Road, and we infer at the junction of Grand Avenue and Gravois Road, is a tavern called (properly, maybe, but this question is not here) the House of the Good Shepherd. From this tavern west to the next street, Chippewa, or at least to a bridge,there is a sharp

down-grade in the road and defendant's tracks for a distance of, say, 600 feet, and from the tavern to beyond the bridge, to-wit, to Chippewa street, any object on the track could be seen by a motorman, though between those points somewhere there was a curve. At the lower terminus of this down-grade, there is a small bridge spanning a creek and this bridge has railings or balustrades to the right and left, and on either side of the tracks of defendant there is barely room for wagons and cars to pass each other on this bridge and the evidence indicates that wagons, known as "manure wagons," could not safely so pass—a manure wagon being the ordinary road wagon with an ordinary bed, superimposed on said bed being sideboards projecting out some distance from the top of the bed and requiring more room than an ordinary road wagon. The Gravois Road is built up from five to twelve feet higher than the surface of the ground on either side and we infer that at the place of the accident the embankment was about twelve feet high. Along this road on either side of defendant's tracks, before reaching the bridge, there is room for wagons to pass cars, but the embankment to the right and left of the tracks was uneven in places, sometimes sloping outwardly from the tracks and sometimes inwardly to the tracks, and as it approached this bridge the embankment narrowed itself a few feet to the dimensions of the bridge. Snow and sleet had fallen a few days before and the rails of defendant's tracks are described as "sweaty," or somewhat slick. The snow had been pushed from the tracks to either side and left on that part of the road traveled by vehicles, and such part of the roadway is, also, described as "slick." At about 12 m. on said date, a cold winter day, six loaded manure wagons were being driven slowly west on Gravois Road from the House of the Good Shepherd down said hill towards said bridge. These wagons, commencing with the hindmost and following in their order, were driven by Basel, Hummert,

Stolle, Heuseler, Ebert and Beier—the latter the plain-
tiff. At first they were all on the north or right-hand
side of defendant's north track, but somewhere between
the tavern and the bridge, and while the car doing the
damage was between the same points, Stolle crossed
from right to left and thereafter the procession moved
on west in a walk with five wagons on the right and one
on the left of defendant's north track. Some of the
wagons including plaintiff's, which was in the lead,
were outside the track, but the wagon next to plaintiff's,
Ebert's, "spread" the north rail, i. e., his left-hand
wheels were on one side of the rail and his right-hand
wheels on the other, and Ebert had been proceeding in
this way for, say, 100 to 150 feet, according to plain-
tiff's evidence, but according to defendant's evidence it
was not so, as will presently appear.

It seems this procession of wagons had been on
Grand Avenue and turned into Gravois at the tavern,
and, while on Grand Avenue and about at the tavern,
some of them had been on defendant's track and the
motorman of the car in question, "Cherokee No. 74,"
had a verbal squabble with one of them for being on
the track and called him a "d—d hoosier," whatever
that may mean—thus showing aggravation over the use
of the tracks by wagoners.

There was evidence from passengers that the car
ran down grade unchecked until the instant of the col-
lision.

The gloom, nisi, was brightened a bit by a gentle
glow of humor at one place. Thus: a lady passenger,
through some power of feminine intuition, i. e., ability
to see the shadows which coming events cast, testified
she read the impending collision in her own feelings,
and in the manner and voice of the motorman. ('Twas
thus Goldsmith's sapient school boys, intently and cun-
ningly eyeing the master, "learned to trace the day's
disasters in his morning face.") The good lady spoke
in chief as follows: "Q. What was the first thing you

noticed of this collision? A. When I got on the car''
(at the House of the Good Shepherd) ''I was so ner-
vous I thought there was going to be an accident. Q.
Why did you think so? A. Because the motorman
seemed so mean and saucy before he started the car.''
On cross-examination she stood by her guns, thus: ''Q.
You knew there was going to be an accident happen
there anyhow? A. Yes, I did. Q. How did you know
that? A. Because I felt like that and I was so nervous,
and the motorman was so mean.'' The evidential value
of her after-the-fact and Cassandra-like prophesying
was weakened a morsel by a too wide play in generali-
zation, as witness the next question and answer: ''Q.
They are *all* mean, are they not? A. *Yes sir, indeed
they are—most of them, anyhow.*''

There is other evidence that the car, Cherokee No.
74, stopped at the tavern and there took on more pas-
sengers, and, while so doing, the procession of manure
wagons turned into Gravois Road, got ahead of the
car (also turning the corner there) and passed on down
towards the bridge, as said. Plaintiff's evidence also
tended to show that as the car left the tavern and went
down grade the brakes were not controlling its move-
ment. Some of the evidence indicated that when Stolle
passed from one side of the north track to the other,
the bell or gong was rung. Other evidence indicated
that from that time on for 200 feet or so no bell was
rung. On the question of its rate of speed generally,
while covering the ground from the tavern to the point
of collision, the evidence may be summarized as fol-
lows: one witness testified it ran at a rate of fifteen or
twenty miles an hour; another, that it ran ''pretty
fast;'' another, that it ran ''pretty lively;'' another, a
passenger, that it ran ''pretty rapidly;'' another pas-
senger, that it ran ''very rapidly;'' and one of defend-
ant's witnesses testified that it went at a ''pretty lively
rate.''

The evidence further tended to show that these

wagons were somewhat strung out, were all in plain view of the motorman after his car left the House of the Good Shepherd, and that the rear wagon was over 200 feet behind plaintiff's, and Ebert's, about fifteen feet behind plaintiff's. Plaintiff's evidence, furthermore, tended to show that when the car passed Basil, Hummert, Stolle and Heuseler it struck Ebert's wagon and knocked it ahead, caught up with it, rammed it again, fastened itself to it, then jammed it against plaintiff's wagon, which, as said, was outside of the track, tumbled it over the embankment, smashing and entirely destroying it and the harness, and overturning the wagon into what some of the witnesses call a ditch, some a hole and some the creek, with plaintiff pinned underneath—part of the wagon resting on his chest. Ebert's horses ran for a block or so and Ebert did not return. The conductor and others went down, and took plaintiff out of the ditch from under the debris of the wagon. However, the motorman went not down, withal, but seems to have had his attention momentarily diverted—witness the following testimony from the conductor, introduced (as part of the *res gestae,* possibly) without objection, thus: "Q. Did you go down before—or who went down first? A. I went first and called for help. Q. Did the motorman follow you? A. No, sir, he couldn't. Q. Why? A. Because there were so many after him. . . . They were after him, but how he was got off the car I could not say. Q. Didn't you see him there where the wagon was after the accident? A. He was on the ground there by the wagon—he was all around, everywhere. He was just all around there. Q. Did you see him running and see the people after him? A. Yes, sir."

The wagon was pitched over at the west end of the bridge and there is evidence indicating that Ebert's was struck while on the bridge. Ebert heard no bell and did not know the car was in his vicinity until his

197 Sup.—15

wagon was struck. Plaintiff heard a bell just at the instant his (Ebert's) wagon was struck, gave a glance back, saw the car at hand and his wagon was struck at once by Ebert's.

The theory of defendant, and which its testimony tended to establish, was that all of these wagons were clear of the track after Stolle crossed; that the power was off the car as it went down the grade; that the brake was on somewhat and the motorman in position and attentive; that while thus proceeding, Ebert turned his horses quickly and drove on the track immediately in front of the car when it was too late to stop; that the motorman gave a sharp alarm with his gong, put on brakes and reversed his power; but that the accident was unavoidable, the car then being but its length away, and struck Ebert's wagon a diagonal blow, forcing it against Beier's and knocking Beier's off the embankment, and thus, as said, injuring plaintiff and destroying his wagon and harness. Having testified that the car ran its own length after Ebert pulled to the left on the track, the conductor further testified: "Q. About how short did that car stop from the place where it struck the wagon to where it stopped? A. About eight or ten feet. Q. Then, of course, it could be stopped within eight or ten feet on that track on that day? A. It was done, yes, sir.

There was some evidence on behalf of plaintiff to the effect, that, while Ebert's wagon spread the north rail, yet when on the bridge, and we think after the first blow by the car, being unable to pull sharply to the right because his wheels were too close to the north rail and because of the balustrade of the bridge, he undertook to save the situation by pulling to the left to get on the south track, but the details of this testimony seem not material to the issues here.

Under these pleadings and this testimony, the court refused a mandatory instruction for defendant and gave instructions numbered 1 and 2 for plaintiff—de-

fendant excepting. Instruction numbered 2 relates to the measure of damages and needs no attention. Instruction numbered 1, given for plaintiff, is as follows:

"If the jury find and believe from the evidence that one William Ebert was driving a two-horse team drawing a wagon load of manure on the north side of Gravois Avenue, partly in the west-bound track of the defendant railway, and that a car of defendant in charge of its servants, or employees, ran into said wagon and forced said wagon against a wagon being driven along said Gravois Avenue in a westerly direction by the plaintiff Ernst Beier, and caused the wagon with said Ernst Beier to be thrown down an embankment and injured then the jury will find a verdict for the plaintiff Ernst Beier; provided, the jury further find and believe from the evidence that the motorman in charge of said car saw, or by the exercise of reasonable care and diligence would have seen, the said William Ebert in a position of danger from the approach of said car, in time to have stopped said car, by the exercise of reasonable care and diligence, with the means at his command, before colliding, and further find that said motorman failed to exercise reasonable care and diligence to bring said car to a stop, after he discovered, or by the exercise of ordinary care and diligence would have seen, said Ebert on the track, in time to have averted the collision."

The court gave all instructions (except the demurrer) prayed for by defendant, as follows:

1. "The court instructs the jury that there is no evidence in this case to support the plaintiff's charge that the car was being operated at an unlawful speed, or that the motorman failed to sound his gong.

"Under the law a motorman in charge of an electric car has the right to presume that a traveler driving along parallel to the track and in a position of safety from a passing car will not drive on or dangerously near the track, and that a traveler driving on the track

will drive off the track to allow a car to pass. The motorman has the right to act on this presumption until the traveler does some act that would indicate to a reasonably careful person that the traveler was unaware of the approach of the car. And after the motorman has discovered or by the exercise of ordinary care might have discovered that a traveler is driving on or dangerously near, or will not drive off, the track, he (the motorman) is then bound only to use ordinary care in stopping his car to avert a collision.''

2. ''The court instructs the jury that before, under any circumstances, the plaintiff can recover in this case, the law compels him to prove by a preponderance of evidence, that the motorman, in charge of car, was negligent in failing to stop said car after the dangerous situation of the said Ebert's wagon was, or by the exercise of ordinary care, could have been discovered in time to avoid a collision.

''The mere fact that there was a collision is no evidence in this case that defendant's motorman was guilty of any act of negligence charged in the plaintiff's petition.''

3. ''The jury are further instructed that if they believe from the evidence that plaintiff's team was in front of the one driven by Ebert, and that Ebert undertook to pass the plaintiff's team by pulling, or driving around him, and in so doing came suddenly upon the track in front of the moving car, and so near that the motorman in charge of said car had not the means, time or ability to stop his car and avoid striking Ebert's wagon, then the defendant was not guilty of such negligence as will authorize the plaintiff to recover in this action, and your verdict must be for defendant.''

4. ''The court instructs the jury that if you find and believe from the evidence in this case that Ebert was driving west on the defendant's track, along Gravois Road and as the defendant's car approached the said Ebert's wagon, the said Ebert attempted to drive his

team out of the defendant's track so as to permit the said car to pass and that there was no reasonable and apparent cause why the said Ebert should not have gotten his team off the track in his attempt to do so, then the motorman had a right to presume that the said Ebert would clear the track for the car to pass, and if you find that the motorman used ordinary care in watching the said Ebert and in stopping his car after the motorman had discovered that said Ebert was not going to clear the track, then, your verdict must be for the defendant.''

The record facts pertaining to the exclusion and admission of testimony will be supplied when that assignment of error is under consideration.

On this record, was the verdict the product of a fair trial? Appellant insists it was not, for that appellant's mandatory instruction should have been given, for that the instructions for plaintiff should not have been given, for that the defendant should have been permitted to read in evidence the prior statements of two of defendant's witnesses, Stolle and Meuser, and further erred in permitting plaintiff's witness, Tiemann, to relate part of a conversation between him and defendant's motorman after the collision.

I. The first insistence of defendant is, in effect, that there was no case to go to the jury. But self-evidently there can be little merit in this contention under the facts of this record. And this is so, because the car was running down grade for 600 feet in a public street, in full day, with no obstruction to the motorman's vision. In front of the motorman was a slow procession of loaded and wide manure wagons rightfully on a high embankment and on either side of its track, with the head of that procession approaching a bridge where the embankment narrowed and upon which bridge it was barely possible, if at all, for one of such wagons to pass a car on the right-hand side. Not only so, but as the procession was scattered along

back for, say, 200 feet, the wagons north of the north track had no room to spare. Not only so, but we must assume, under a demurrer to the evidence, that the jury believed plaintiff's evidence showing that the track was not clear and that the second wagon from the front was straddling the north rail for 100 to 150 feet. The situation, then, was highly ticklish and delicate and ordinary care under such circumstances required this car should move into that procession under full control, and that the motorman should approach that bridge realizing he might instantly have to stop his car because of danger to persons and property in front. It was his bounden duty, therefore, to keep a vigilant watch and to put his car under control and there is ample evidence tending to show he negligently ignored the situation and did neither.

That this case was entitled to go to the jury under the circumstances here presented is not an open question in this State. [Schafstette v. Railroad, 175 Mo. 142, and cases cited therein, as well as in respondent's brief.]

II. But it is claimed by defendant there was (1) no evidence as to the rate of speed, and (2) no testimony tending to show the car could have been stopped after the danger of a collision became apparent. Neither of these contentions, in our opinion, is sound under this proof. Because:

(a) True it is that only one witness, and he illy qualified to speak, placed an estimate on the car's speed in miles per hour. But it requires no expert to tell when a car is going fast, and the record abounds with evidence tending to show this car was going fast. Speed may be negligent under critical circumstances, as in this case, and at the same time be ordinance speed, or less. In other words, unlawful speed my be one thing and negligent speed may be another. For instance, a car under a general ordinance might be allowed to move at ten or fifteen miles an hour through a city and yet

ordinary care, *i. e.*, the care that an ordinarily prudent person would or should exercise under similar circumstances, is a comparative thing. What would be ordinary care under one condition might be stark negligence under another. The care necessary in the affairs of men shifts with, and automatically adjusts itself to, the circumstances of the case, and could it be said that a prudent person would allow a car to plunge through a procession of heavily loaded wagons on a high and narrow embankment and over a bridge such as this, with a wagon ahead of it straddling the track, at a rate of speed indicated by this proof, ordinance or no ordinance? We think not. The law is not so written and no soundly reasoned-out case can be found in the books sustaining that view. The petition does not proceed on the theory of a violation of ordinance speed or that the speed was unlawful in the sense that it was in excess of ordinance provision. The pleader sets forth the whole situation at the time and avers that the car was, under those circumstances, proceeding negligently in speed, in the lack of warning and in not being under control, *i. e.* it states a case of negligence at common law. [Heinzle v. Railroad, 182 Mo. l. c. 555; Klockenbrink v. Railroad, 172 Mo. l. c. 689-90.]

(b)  Considering the contention of defendant to the effect that there was no testimony tending to show that the car could have been stopped after the danger of a collision became apparent, it is in substance, as we understand it, a contention that plaintiff should have proved in what distance a car going at the rate of this one could have been stopped on that grade and condition of track, and, failing so to prove, the case falls to the ground. But in a forum of reason, why incumber a case with the opinion testimony of experts as to the distance in which a given car going at a given rate down a given grade on a given condition of track can be stopped, *when there is evidence in the case that the car was actually stopped in its own length plus eight or ten*

*feet,* for such was the substance of the conductor's testimony. If it be true that Ebert's wagon straddled the north rail for 100 or 150 feet before it was struck and that his team were going in a walk, then it requires no expert to tell a jury or a court that while he covered the 100 feet, this car could have been placed under control and all danger of a collision averted, under the facts of this case. And this is so, because the car during that time must have moved several hundred feet and the position of Ebert's wagon was notice to the motorman that a collision was inevitable unless Ebert got out of the way—even courts and juries being presumed to know that two solid bodies can not (without trouble) occupy the same space at the same time (if at all) and may use their common sense in determining without formal proof, under circumstances like these, that a car may be stopped in time to avert injury. [Latson v. Railroad, 192 Mo. 449.]

III. The court instructed the jury for defendant, that there was no evidence the car was being operated at an "unlawful speed," and no evidence that the motorman failed to sound the gong. If by *unlawful* speed was meant *negligent* speed, and if by gong was meant bell, and if the verdict had been the other way, there would be a serious question in the case whether, on the insistence of plaintiff, that instruction would not be error. As it is, however, defendant can not (and does not) complain that the court erred in its own behalf.

In this connection it is contended by defendant that instruction numbered 1 for plaintiff, which ignores the rate of speed and ignores the sounding of the gong and puts the case to the jury on broad lines, was error. It was error, defendant's learned attorneys say, because defendant's negligence is alone predicated in the petition on the rapid speed and the failure to ring bell or gong. In other words, the court took unlawful speed away from the jury and took from the jury the ringing of the bell, hence, there was nothing left to predicate

negligence on. But we do not read plaintiff's petition that way. The first paragraph charges defendant with so "negligently, carelessly and unskillfully operating said car that it suddenly and with great force ran into a wagon," etc., then being driven in a westerly direction, etc., and forcing said wagon against plaintiff's wagon and upsetting the latter over an embankment on the north side of Gravois Road and caused plaintiff to fall thereunder and be seriously injured. The petition further counts on the theory that it was defendant's duty to keep said car under control, under surrounding conditions and circumstances, and that defendant negligently omitted that duty and it avers that defendant's motorman knew, or by the exercise of ordinary care would have known, that the car and the wagons would come in contact at or near the bridge. If, now, we apply the law as declared in instruction 1 to the facts of this case, and to the pleadings, as thus interpreted, the harmony of the instruction with the pleadings and with the facts in judgment and with the general principles of law is apparent, and, therefore, we disallow the assignment of error predicated on the giving of instruction 1 for plaintiff.

IV. The witness, Stolle, subpoenaed by both parties, was placed on the stand by defendant. This witness was one of the wagoners referred to in the foregoing part of this opinion, and had made a statement to defendant's claim-agent shortly after the accident, which was reduced to writing and signed by him. In his examination in chief, as well as cross-examination, his testimony ran counter to his said *ex parte* statement on material matters and unfavorably to defendant. Defendant also placed upon the stand one Meuser, a carpenter. The record does not show he was subpoenaed by more than one party, the defendant. Be that as it may, he also presently after the affair had made and signed a statement and, when placed on the stand by defendant, could not remember the transac-

tion as it was put by him in his signed statement to defendant's claim-agent—the trouble in his evidence being not so much a variance to his prior statement, as "flunks" of memory—*non mi ricordo*—the same frailty Lord Brougham met up with in the witnesses in Queen Caroline's Case. [See trial of Her Majesty, Caroline Amelia Elizabeth, Queen of England, before the Peers of Great Britain, Arranged for Dolby's Parliamentary Register, 1820.]

Having been allowed by the trial judge to cross-examine and sift these witnesses closely on these contradictions and lapses of memory—going so far as to allow defendant's attorney to show each witness his signed statement and to allow him to identify the signature and to read the statement itself, and going so far as to compel the witness to listen to questions and answers therein and to say categorically whether he had not stated thus and so—defendant, claiming surprise, then offered these signed statements in evidence and they were excluded, defendant excepting and now assigns error in this behalf, under the authority of Clancy v. Railroad, 192 Mo. 615.

A consideration of this assignment of error trenches upon one of the closest and most vexed topics of the law. To disallow such evidence has been said by some courts to permit a party to be caught in a trap, *i. e.*, sacrificed to a designing witness after having been toled by prior statements and admissions into putting him on the stand. On the other hand, the allowance of this character of evidence has been said to "enable the party to get the naked declarations of a witness before the jury, operating, in fact, as independent evidence; and this, too, even where the declarations were made out of court, by collusion, for the purpose of being thus introduced." [1 Greenleaf on Ev. (16 Ed.), sec. 444, et seq.] All the well-considered cases allow a surprised party to cross-examine such recusant witness so that his memory may be refreshed and, peradventure, his

sleeping conscience pricked into wakefulness and the truth brought out. [30 Am. and Eng. Ency. Law (2 Ed.), 1130; Creighton v. Modern Woodmen, 90 Mo. App. l. c. 383, et seq., and cases cited.]

The law has nowhere shown greater wisdom than in refusing to lay down a hard and fast rule to be followed whether or no by courts, *nisi,* in the admission of this class of evidence—in other words, in leaving largely to the trial judge the exercise of a wise discretion to be applied to suit the varying conditions presented to him suddenly as they arise—that discretion being subject to judicial review. Based on the citation and discussion of the Missouri authorities, the learned judge speaking for this court in the Clancy case, said: ''The question 'for decision, therefore, is whether this case falls within the general rule that a party calling a witness can not contradict or impeach him, by showing that he has made other statements contradictory of his evidence, or whether it falls within what may be the exception to the rule, to-wit, that the witness, or the adverse party to the cause, has entrapped or misled the party calling the witness, by some artifice, so as to induce him to call the witness, and thereby to gain an advantage in the case over the party calling him, which the adverse party would not have had if he had called the witness.'' It will be seen that in this, our latest pronouncement, the general rule, universally recognized by the profession and the courts, to-wit, that a party may not impeach the credibility of his witness by evidence of general bad reputation, is left untouched. It will be seen, furthermore, that the general rule that a party calling a witness can not contradict or impeach him by showing he has made contrary statements is still left intact as a general rule of law, subject, as all general rules are, to exceptions. It will be seen, furthermore, that before a party calling a witness is entitled to impeach him by putting in evidence his contradictory statements, he must have been entrapped or misled by

trick or artifice by the other party or by the witness, into calling such witness and making him his own. The whole discussion in the Clancy case proceeds on this theory, and the facts in the case at bar in nowise bring it within the reasoning and doctrine of the Clancy case. Here the plaintiff did nothing to entrap or trick the defendant. The only thing plaintiff did was to subpoena Stolle and then refuse to call him, and it would be a novel doctrine to announce from the bench that a party misled or tricked his antagonist by merely issuing a subpoena for a witness and by not putting him on the stand. How do we know but that plaintiff was led into refusing to call this witness by the very fact that defendant had also subpoenaed him, and, in this view, the contention of defendant becomes a two-edged sword and cuts both ways. The close cross-examination allowed of both witnesses discloses no trick or artifice on the part of either of them, such as disclosed in the Clancy case. Neither did defendant make any affidavit of surprise. Neither did defendant show that during the long lapse of time between these statements and the trial (over two years) it had made any effort to see whether these *ex parte* statements were remembered or would be sustained by the witnesses under oath, nor was there any suggestion made to the court below of, nor attempt made there to show, collusion between the plaintiff and said witnesses, or either of them, to tole defendant into a snare. The nearest approach to such suggestion is made, *arguendo,* by defendant's learned counsel by a reference to Stolle as "one of the clan." By this, we assume, he is charged with being a gardener along with plaintiff and the other wagoners who testified on his behalf. But it can hardly be expected this court would place a judicial mark or ban on gardeners, *eo nomine*—gardening being the original and ideal occupation of mankind and both court and counsel being related (distantly, to be sure) to the original gardener himself, one Adam—a relationship fancifully

recognized in one notable instance by a modern party weeping at his grave. (See 1 Twain:Innocents Abroad; see, also, I Tennyson: Lady Clara Vere de Vere, Stanza VII, when time permits.)

The exclusion of this offered evidence, in our opinion, was right, and within the controlling authorities. [Creighton v. Modern Woodmen, supra; Dunn v. Dunnaker, 87 Mo. 597; State v. Burkes, 132 Mo. 363; Imhoff & Co. v. McArthur; 146 Mo. 371; Fearey v. O'Neill, 149 Mo. 467.]

V. It will not be necessary to extend this opinion by setting down the record details upon which defendant bases its insistence that error was committed in permitting plaintiff's witness, Tiemann, to relate a part of a conversation between him and defendant's motorman after the collision. The motorman was not present at the trial, but a statement was read as and for his testimony. The record is not satisfactory as to whether this was done under the statute permitting facts set forth in an affidavit for continuance to be read in certain contingencies. [R. S. 1899, sec. 687.] If the statement of the motorman was read from an application for a continuance, then there can be no doubt of the correctness of the ruling, *nisi,* because under such circumstances "the opposite party may disprove the facts disclosed, or prove any contradictory statements made by such absent witness in relation to the matter in issue and on trial." See last clause of said section. There are some earmarks in the record showing that the ruling of the trial court was based on said provision of the statute. But whether this be so or not, it is not clear to us that the remarks, being made in the presence of the witnesses to the transaction, the bystanders, and on the very scene and heels of the accident, may not have been admissible as *res gestae.* But whether so admissible or not, the court refused to allow this witness to go into the details of such conversation and the evidence trickling to the jury was not of significance

enough to warrant us in reversing and remanding this case; because, if the ruling of the trial court be error, it was not error materially affecting the merits.

In our opinion, the judgment should be affirmed, and it is so ordered.

*Brace, P. J.,* and *Valliant, J.,* concur; *Graves, J.* not sitting.