FRED RHOMBERG, RESPONDENT, v. CHARLES ISRAEL, APPELLANT.*

Kansas City Court of Appeals. April 4, 1927.

---

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 2616, p. 705, n. 96; Damages, 17CJ, section 413, p. 1097, n. 98; Trial, 38Cyc, p. 1483, n. 30; Witnesses, 40Cyc. p. 2694, n. 10.

*Clif Langsdale* for respondent.

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

ARNOLD, J.—This is an action in damages for personal injury.

The suit was instituted against the Baker Ice Machine Company, a corporation engaged in installing ice machines and apparatus for the manufacture and preservation of ice, E. Louis Mertz, foreman of said corporation, and Charles Israel, doing business as the Israel

Motor Transfer Company. Before the suit was tried, the Baker Ice Machine Company compromised with plaintiff for $2500, and the cause was dismissed as to that company and its foreman, Mertz. The cause proceeded to trial against defendant Israel, resulting in a verdict for plaintiff in the sum of $5000. Motions for a new trial and in arrest of judgment were overruled and defendant has appealed.

Plaintiff was a boiler maker and at the time the injury occurred, July 19, 1923, was in the employ of the Baker Ice Machine Company and under the direction of its foreman, Mertz, was engaged in installing ice machine equipment in the basement of the Kansas City Athletic Club building at the northwest corner of Eleventh street and Baltimore avenue in Kansas City, Mo. As part of the apparatus being so installed by the Baker Ice Machine Company was a large steel tank in two sections, said sections to be lowered separately. The one being lowered at the time of the accident was about three feet long, six feet wide and six feet deep, made of three-eights inch steel and weighing about 5000 pounds. The steel tank had been sold to the Ice Machine Company by the Missouri Boiler Works Company and the latter company had employed defendant Israel Motor Transfer Company to deliver it to the Ice Machine Company "on truck" at the Athletic Club building. The Ice Machine Company had employed the same transfer company to lower the tank into the basement of the building. For this purpose the Israel Company had sent to the building site an automobile truck to which was attached a winch, a part of which was a drum or spool over or around which ran a wire cable. This drum was operated by connecting a clutch thereto attached, with the motive machinery of the truck. The movement of the drum then would cause the cable to be wound up and thus pull the attached load. It appears there was no reverse power to unwind the cable from the drum but the cable was unwound by disconnecting the clutch from the motor of the truck, thus permitting the load attached to the cable to pull it backwards, the lowering operation being controlled by the brakes.

The truck to which the winch was attached was placed on the east side of the Athletic Club building on Baltimore avenue, adjacent to a hole in the sidewalk, about sixteen feet long and twelve to fourteen feet wide. The section of the tank in question was unloaded from a trailer attached to the truck, by means of chains; one end of the cable wound around the drum was attached to the chains and the section of the tank was pushed and "pinched" over to where it could be balanced and lowered through the hole to the basement floor. In this process, and before the floor was reached, some part of the lowering apparatus gave way and permitted the tank to fall to the floor of the basement. It then became necessary to raise the tank sufficiently to allow rollers to be placed thereunder so that the tank might the more easily be placed where it was intended to be installed. One Campbell

240

and two other men employed by Israel had been sent with the tank, the winch and other apparatus for lowering the tank into the basement, pursuant to arrangements made a day or two prior.

There was testimony tending to show that when the section of the tank fell into the basement, as above stated, it lodged against the east wall thereof. Israel's foreman, Campbell, testified that the tank fell into a jam between the east wall and a column located in the basement, and had to be pulled out. It is shown that a steel beam was placed across said hole in the sidewalk extending east and west; that a pulley or block was lashed to it and the cable from the drum, or winch, was passed through said pulley and into the basement, where it was attached to the section of the tank for the purpose of raising it by the winch.

Campbell testified it was desired to pull the tank upward and to the north for the purpose of extricating it from the jam into which he stated it had fallen. A number of other witnesses, however, testified the tank had not fallen into any jam and was not in contact with any column; that it was desired only to pull the tank straight upward and that the cable ran from the beam aforesaid straight down to the tank and, therefore, there was only a straight pull upward on the cable. Thus there was something of a conflict in the evidence in this respect. At any rate, when the cable was attached to the tank, defendant's foreman Campbell started the motor power and threw in the clutch of the drum and attempted to lift the tank, without success, resulting only in some "jerky" movements.

Thereupon plaintiff and two other men, all employees of defendant Israel, secured a piece of timber four by six inches and twelve to fourteen feet long and used it as a pry to help lift the tank off the floor. In order to use the said timber effectively, they placed a piece of six by six timber near the tank and used it as a "heel" placing the end of the timber under the tank forming a fulcrum. When the pry was thus set, Campbell applied the power of the truck and began to pull with the winch and cable. By means of the combined power of the pry and the winch, the tank was raised a foot or so and then fell back, causing the pry to fly upward, the end thereof striking plaintiff in the jaw and under the chin. The cable came down with the tank, unwinding somewhat and becoming slack.

It is in evidence that the foreman Campbell stood at the hole in the sidewalk at the street level, watching the men place the pry under the tank, and when this was done he started the power in an effort to raise the tank. It appears that plaintiff was rendered unconscious by the blow and that his jaw bone was fractured to the extent of causing him to lose a number of teeth and that he was otherwise injured. The petition is formal and charges negligence as follows:

". . . plaintiff states that the defendants carelessly and negligently used said apparatus to raise and move said tank at said time

and that the raising of said tank by said apparatus was too great strain upon said apparatus and that defendants and each of them knew or by the exercise of ordinary care would have known that because thereof, said apparatus might and would weaken and give way while said tank was being raised and moved as aforesaid, and permit said cable to slacken and slip backward, and cause said tank to fall and injure plaintiff, whom the defendants knew, or by the exercise of ordinary care would have known, was working as aforesaid, at and near said tank with a piece of timber which he was using as a pry with one end under said tank. Plaintiff states that said apparatus did cause and permit said cable to slip and slacken, said tank to fall, and that the falling of said tank caused said timber or pry to strike plaintiff and injure him as hereinafter set out. Plaintiff states that his injuries herein complained of were caused by the said negligence of defendants.

"For other and further assignments of negligence against the defendants, plaintiff states that the defendants negligently used said apparatus to raise and move said tank at said time, when they knew, or by the exercise of ordinary care would have known, that the strain of so doing was too great for said apparatus and for the clutch of and connected with the drum of said apparatus, and that because thereof while so raising and moving said tank, the said clutch might and would slip and permit and cause said tank to fall and injure plaintiff whom the defendants knew, or by the exercise of ordinary care would have known, was working at and near said tank with said pry as aforesaid."

The answer is a general denial and a plea of contributory negligence, to-wit: That plaintiff failed to heed warnings to stay away from said tank; that without orders and as a volunteer, plaintiff went near the tank and undertook to use a pry about the same. Further answering, defendant states that if plaintiff was injured as alleged in the petition, he has been paid the sum of $2500 on account thereof by the Baker Ice Machine Company and E. Louis Mertz, and that the same was accepted by plaintiff as full and complete satisfaction of all claims by him on account of said alleged injuries.

In support of the appeal, defendant urges that the court erred in permitting plaintiff's counsel to interrogate witness Campbell, whom plaintiff had placed on the stand, as to whether he had not made a written statement and testified by deposition that the clutch of the winch slipped, which statement and testimony were contradictory to testimony he had given on the stand at the trial. The objection is that the ruling of the court permitted plaintiff to violate the general rule of law that a litigant may not be allowed to impeach his own witness.

The facts of record relative to this matter are that some time after the accident, a representative of the Baker Ice Machine Company, then a defendant in this suit, called upon John H. E. Campbell who

was in charge of defendant's truck, winch and apparatus involved in the accident, and about August 23, 1923, secured from him a written statement with reference to the cause of the accident, including the following:

"My truck did not slip any; however, as the tank kicked forward, the clutch on my truck slipped, and about this time I heard the men in the hole holler, and I reached over and killed the engine."

On May 27, 1924, Campbell's deposition was taken by counsel for plaintiff, and on direct examination therein, he testified as follows:

"Q. Did your clutch slip? A. No, sir.

"Q. You were the driver of the truck? A. Yes, sir.

"Q. Did you say to anyone that your clutch slipped? A. No, sir.

"Q. Did anything happen to your clutch at all? A. No, sir."

After plaintiff's counsel had finished his examination in taking the deposition, counsel for the Baker Ice Machine Company examined Campbell, showing him the written statement just quoted, and the following occurred:

"Q. What do you mean when you say the clutch slipped? A. My drum clutch, not my motor clutch.

"Q. It was the drum clutch that was moving the tank forward? A. Both clutches were moving it forward.

"Q. Which clutch did you mean? A. The drum clutch is the one that slipped. The motor clutch never did slip.

"Q. When you said in this statement that the clutch slipped you meant that the drum clutch slipped? A. Yes, sir."

At the trial herein, Campbell testified that the slipping of the drum clutch would have permitted the drum to reverse and the cable wound around it to go backwards and the tank to fall. Witness testified that the pressure of the clutch, which is a cone-shaped or funnel-shaped affair, would keep the drum from turning back; and that the load could not reverse while being raised without this clutch slipping or becoming disconnected; it would be impossible for it to reverse if the clutch were "in" and pulling forward. It appears that several witnesses testifying for plaintiff stated that while the tank was being raised it fell back to the basement floor and the cable holding it recoiled and came back. Counsel for plaintiff also had the deposition of witness Campbell in which he testified that the clutch connecting the drum with the motor power of the truck had slipped, permitting the drum to reverse, the cable to unwind, and the tank to fall.

Counsel for plaintiff offered to read Campbell's said deposition when the following colloquy took place:

"MR. LANGSDALE: I am going to read the deposition of John Campbell.

"MR. HOUTS: If your Honor please, there is no foundation yet for reading his deposition. He lives in Kansas City.

"Mr. Langsdale: Mr. Campbell, at the time the deposition was taken, lived at 1317½ Locust street. I made effort to find him there, and they informed me there that he has left that place and that they do not know where he is; that he left no address.

"Mr. Houts: He is down here at the court house out in the hall there.

"Mr. Langsdale: Bring him in then. I sent a subpoena out this morning, and have a return on it from the sheriff to the effect that he could not be located; and I went out in the hall and called for Mr. Campbell thinking he might be out there, and he did not appear."

Campbell was called into the court room and placed upon the witness stand by plaintiff. The record shows that he proceeded to testify directly contrary to his testimony in the deposition, and the purport of the written statement previously given, and on the witness stand his testimony, in part, was as follows:

"Q. And the clutch of your drum, what happened to it? A. Nothing.

"Q. Wasn't there something happened? A. Nothing. .

"Q. Didn't it slip? A. No, sir."·

A somewhat extended argument ensued between counsel for parties in the presence of the court and out of the hearing of the jury, as to what course counsel for plaintiff should be permitted to follow, in order that he might show to the jury that he had a right to expect different testimony from this witness when he put him on the stand. It was plaintiff's position that he had a right to read from the deposition upon the ground of surprise; further, plaintiff contended he had the right to refresh the memory of the witness by reading from the deposition and statement. After further argument on both sides, the court said:

"Now, I understand that you are disappointed in what this witness stated. He has not stated what you thought he would state when you put him upon the stand. Now, in such a case if a witness states differently from what he has heretofore stated, or from what you expect him to state, you have a right to put yourself in proper position before the jury. But you have no right to contradict this witness. That is my view of it."

The court then advised counsel for plaintiff that he could simply show that he was misled in putting Campbell on the stand, and added:

"I don't think you would have the right—you may ask him whether he did not make a statement so and so in the deposition or in a conversation; but you don't have the right to go ahead and contradict him by offering the deposition or the statement of some other party as to the statement he made at another time."

The court ruled that counsel might show surprise by "asking witness if he did not make such and such a statement at some other time or in a deposition," but that plaintiff "would not have the right to

bring in another witness to contradict him." The result was that the court refused to permit plaintiff's counsel to offer the deposition in evidence, or permit him to cross-examine the witness from the deposition. It is defendant's contention that the cross-examination under the ruling of the court was not conducted upon the grounds of surprise. In the brief, counsel for defendant states his position as follows:

"Nor did counsel seek to justify the examination complained of on the grounds that it was an impeachment justified by surprise. As appears from the record quoted, he insisted throughout that he was not impeaching the witness, that he was merely seeking to refresh his recollection, but it is clear that the examination was not by way of refreshing the recollection of the witness."

Of course we are not concerned with the theory upon which the cross-examining questions were asked at the trial, but as to whether the questions were proper under any theory. If they were, the point in controversy is thereby determined.

The record shows that when the witness was asked if he did not make answers with reference to the clutch slipping, as contained in the deposition and written statement, he simply said he did not remember. Plaintiff was not permitted to read the deposition. A circumstance to be considered in connection with this point, as shown by the record, is that the sheriff was unable to serve a subpoena upon witness Campbell, because unable to locate him. It is suggested the witness was present at the court at the instance of defendant and thereby was available when plaintiff's counsel sought to read his deposition; that this can be explained only on the theory that defendant knew the testimony of the witness would be of assistance to defendant's cause and that such assistance would not be effective unless witness contradicted the testimony contained in the deposition and written statement.

We think the ruling of the trial court was proper to the effect that this situation made out a case of surprise and that it was upon this theory that the method of cross-examination was permitted. There seems to be some confusion in our case law as to just what are the rights of a litigant under a state of facts such as is here presented. It is urged by defendant that plaintiff filed no affidavit of surprise, but such affidavit is not absolutely necessary where the showing of surprise is strong. [Clancey v. Transit Co., 192 Mo. 615, 91 S. W. 509; Beier v. Transit Co., 197 Mo. 215, 94 S. W. 976; Dixon v. Western Tablet Co., 246 S. W. 619.] In Dauber v. Josephson, 209 Mo. App. 531, 542, 237 S. W. 149, 153, this court said: ". . . it must be borne in mind that whether impeaching testimony should be admitted is a matter largely in the discretion of the trial judge."

It is further urged on this point that even if it were proper for plaintiff to impeach Campbell by showing contrary statements made

by him in his deposition, the method adopted by plaintiff's counsel in asking witness if he did not make answers to certain questions was improper, in view of the opinion of the Supreme Court in the case of Littig v. Heating Co., 292 Mo. 226, 247, 237 S. W. 779. In that case the opinion points out the proper method of proceeding in the circumstances here involved, and that is to offer the deposition and to read those portions thereof which are in apparent conflict with the testimony given by the witness on the stand. Plaintiff admits this is the proper method, but says defendant's counsel insisted the deposition could not be properly offered in evidence and could not be read to the jury. The trial court sustained defendant's contention and thereby forced plaintiff's counsel to conduct the examination as he did. We think defendant may not, therefore, be permitted to complain of the method plaintiff was forced to adopt and therefore hold against defendant on this point.

It is further urged the court erred in refusing defendant's offer of proof that defendant's foreman and traffic manager, McKnight, on the morning of the accident, directed, told and instructed witness Campbell to report to the Baker Ice Machine Company people and to work under the direction of that company and perform whatever work was required in connection with the lowering of the tank into the basement; and that McKnight gave no instructions in respect to the manner of doing the work, but told Campbell that he and the two other employees with him should work under the direction and control of the Baker Ice Machine Company and its foreman exclusively and do whatever was asked of them. This offer of proof was refused upon the objection of plaintiff that it was immaterial. We think the refusal proper because the Baker Ice Machine Company would be bound by any instructions given Campbell by defendant's officer out of the hearing of said company. We hold the only question for the consideration of the jury was, What did Campbell do? The ruling of the trial court was proper.

As a further assignment of error it is charged plaintiff's instruction "A" is broader than the pleadings, in that it attempted to submit the issue of negligence raised by the allegations of the petition that defendant was negligent in using the machinery in question to move and lift the tank when he knew, or should have known it was insufficient and would permit the tank to fall. The contention is that the petition, having pointed out the weakness of the clutch as one charge of negligence, plaintiff was confined to that proof only, under the rule that general allegations in a petition are controlled by specific allegations. One of the charges of negligence in the petition is that defendant negligently used said apparatus ". . . when they knew or by the exercise of ordinary care would have known that the strain of so doing was too great for said apparatus." On its face this is not a general allegation such as could be controlled by a sepa-

rate allegation of negligence to the effect that part of the apparatus was too weak. The instruction was not broader than the pleadings and we find no error in this respect.

Defendant charges error in the ruling of the trial court in permitting counsel for plaintiff to argue the law in the case contrary to the instructions given, and sets out in his brief the offending argument, which we have carefully read. We find nothing in the argument of counsel for plaintiff warranting any other ruling of the court than that made and nothing contrary to the rule in this respect declared in State ex rel. v. Edwards, 35 Mo. App. 680, 685; Manning v. McClure, 168 Mo. App. 533, 536. It is elementary law that counsel in argument may comment on the instructions, but of course improper comments are not allowable. In ruling on the objection of defendant, the court said:

"Oh, well, the instructions are given and of course the jury will read the instruction notwithstanding the comments of the attorneys upon it. The instruction shows for itself. Still I think counsel have the right to say what they think the instruction means, and if they don't give the proper meaning the court can correct them of course on proper objection."

We find no error either in the remarks of counsel or in the ruling of the court relative thereto.

Finally, it is charged the verdict is excessive but we are not impressed with defendant's position in this respect. The verdict was for $5000 and the evidence shows that plaintiff's injury consisted of a compound fracture of the right lower jaw bone; that the fracture was "V" shaped; that the bone was so badly crushed that pieces thereof had to be removed every three or four days covering a period of six weeks; that the proceeding necessary to set the jaw bone for the proper uniting of the fracture was difficult, tedious and painful, lasting several weeks and that it was necessary to take plaster impressions of the lower jaw repeatedly. The fracture is shown to have been directly through a nerve conduit and the sensory nerves supplying the lower lip were paralyzed permanently. As a result of the injury plaintiff lost all his teeth back of the fourth from the front and by reason of the fracture the condition of the jaw is such that the teeth so lost cannot be replaced. After the fragments united plaintiff's lower jaw protruded forward and there was substantial testimony that these conditions will be permanent. Besides, there was loss of time and a doctor's bill of $1500. With such a showing, we are not convinced the verdict is excessive.

For reasons above stated, the judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.