Richard ROWE, Respondent,

v.

FARMERS INSURANCE COMPANY,
INC., a Corporation, Appellant.

No. 66595.

Supreme Court of Missouri,
En Banc.

Oct. 16, 1985.

Daniel E. Wilke, Richard R. Korden-brock, Clayton, for appellant.

James E. Spain, Poplar Bluff, for respondent.

WELLIVER, Judge.

The appellant, Farmers Insurance Company, appeals from the jury verdict which held appellant liable on a contract of insurance issued to the respondent, Richard Rowe. The Court of Appeals, Southern District, affirmed the judgment. This Court ordered transfer to consider whether a party could impeach his own witness. We reverse and remand the case for a new trial.

## I

Respondent's car was found burning by Missouri Highway Patrol Officer Overbey, at about 1:00 A.M., on August 13, 1982. The 1981 Ford L.T.D. was aflame in a lonely rural field approximately 7 miles from respondent's home. Respondent filed a claim with appellant, his automobile insurance company. The claim was disallowed and respondent brought this action.

At trial, appellant contended that respondent either had his car torched to collect the insurance proceeds or later learned who burned his car and did not report this information to the police or to appellant. Appellant called Chester Carroll as a witness. Carroll is respondent's first cousin. On November 22, 1982, Carroll allegedly made several statements to Officer Overbey. Officer Overbey was prepared to testify that Carroll told him on November 22, 1982, that he overheard respondent tell another man that respondent was going to burn his Ford L.T.D. in order to acquire a four wheel drive pickup truck. This conversation, overheard by Carroll, occurred before the Ford was burned.

Carroll's deposition had been taken on June 23, 1983. Respondent visited Carroll about one week before the deposition. In this meeting, respondent and Carroll talked about respondent's suit against the appellant. At trial and in his deposition, Carroll denied overhearing any conversation between respondent and another man. The trial court did not allow the appellant to introduce evidence and expose Carroll's prior inconsistent statement made to Officer

Overbey, relying on the rule that a party may not impeach his own witness.

Appellant also sought to introduce deposition testimony of Ms. Peggy Slavings. Slavings was living with respondent at the time his car was burned. She could not be found to be subpoenaed to testify and she did not appear at trial. On the evening of September 19, 1982, Slavings gave a signed statement to Officer Overbey in which she stated that she saw respondent give his car to three people the night it was burned. In addition, she stated that later respondent's son told respondent that someone saw the son deliver the car to Clyde and Lloyd Brown on the night the car was set ablaze. The court did not allow appellant to read the portion of Slavings' deposition in which she denied making the assertions contained in the signed statement. The court also refused to allow the signed statement obtained by Trooper Overbey to be admitted into evidence. The court gave as its reason that a party cannot impeach its own witness.

The jury returned a verdict for respondent.

## II

Missouri has consistently followed the ancient rule that a party cannot impeach his own witness. *State v. Armbruster*, 641 S.W.2d 763 (Mo.1982). This rule had its beginnings in the primitive English practice of each side to a dispute gathering oath helpers to swear off against the oath helpers for the opposing side. 3A Wigmore, Evidence § 896 (Chadbourn rev. 1970). Oath helpers were partisans and never were witnesses in the modern sense of having personal knowledge of the matter at issue. The credibility accorded oath helpers could influence the outcome of the litigation. The practice of not questioning the credibility of a party's own oath helpers later was applied to the party's own witnesses by English common law courts and later by Missouri courts. *See* 3A Wigmore, Evidence § 896 (Chadbourn rev. 1970); *Dunn v. Dunnaker*, 87 Mo. 597 (1885); *Chandler v. Fleeman*, 50 Mo. 239 (1872),

overruled, *Wells v. GoForth*, 443 S.W.2d 155 (Mo. banc 1969); *Brown v. Wood*, 19 Mo. 475 (1854).

No valid reason for this anachronistic rule would seem to exist today. Commentators have favored abolishing the rule and during the last few decades the overwhelming majority of jurisdictions have followed by allowing a party to impeach his own witnesses with prior inconsistent statements. Comment, Impeaching One's Own Witness in Missouri, 37 Mo.L.Rev. 507, 522–23 (1972). *See also* McCormick, Handbook of the Law of Evidence § 38 (3d ed. 1984); Ladd, Impeachment of One's Own Witness—New Developments, 4 U.Chi.L. Rev. 69 (1936); Morgan & Maguire, Looking Backward and Forward at Evidence, 50 Harv.L.Rev. 926 (1937); Schatz, Impeachment of One's Own Witness: Present New York Law and Proposed Changes, 27 Cornell L.Q. 377 (1942); Comment, Impeaching One's Own Witness, 49 U.Va.L.Rev. 996 (1963). Professor Morgan stated that the rule "has no place in any rational system of investigation today." 1 Morgan, Basic Problems of Evidence 64 (1954).

Parties no longer freely pick their witnesses as they freely picked "oath helpers." Today, parties are forced to take their witnesses as they find them. Since parties may not know their witnesses or be familiar with their honesty or credibility, it seems foolish to talk about a party guaranteeing the credibility of his witnesses.

> Witnesses are not made to order.—at least, not by honest people.... If a lawsuit was a manufacture, and the party bringing it could select his materials—facts and witnesses—there might be some propriety in holding him responsible for the character of these materials; but, as both are beyond his control, his responsibility for their character is out of the question.

3A Wigmore, Evidence § 898 (Chadbourn rev. 1970) (quoting May, Some Rules of Evidence, 11 Am.L.Rev. 264 (1876)).

The ability of courts and juries to determine the truth of an event is not served by creating a limitation that a party not im-

peach his own witnesses. 3A Wigmore, Evidence § 898 (Chadbourn rev. 1970). With the information provided by impeachment, the jury can consider the witness's credibility and more accurately draw inferences from the testimony. The jury should not be denied information about the credibility of witnesses solely because of who called the witness.

Some supporters of the orthodox rule contend that allowing impeachment permits the calling party to coerce favorable testimony. Dean Wigmore dismissed this justification stating:

> But, after all it is a reason of trifling weight. It cannot appreciably affect an honest and reputable witness. The only person whom it could really concern is the disreputable and shifty witness; and what good reason is there why he should not be exposed?

3A Wigmore, Evidence § 899 (Chadbourn rev. 1970).

These reasons have persuaded the overwhelming majority of jurisdictions to abandon the orthodox rule.[1] McCormick, Handbook of the Law of Evidence § 38, at 84 (3d ed. 1984). Along with these jurisdictions, the American Law Institute's Model Code of Evidence, adopted more than 40 years ago, expressly stated that the calling party could impeach a witness. Model Code of Evidence Rule 106 (1942). More recently, the Federal Rules of Evidence provide that, "[t]he credibility of a witness may be attacked by any party, including the party calling him." Federal R. of Evid. 607. The Uniform Rules of Evidence, promulgated in 1974, have a provision identical to that of the Federal Rules of Evidence allowing impeachment of a witness by a calling party. Uniform Rules of Evidence 607 (1974).

■ Based upon our own analysis and the experience of the vast majority of jurisdictions including the federal courts, we conclude that the time has come for us to recognize the right of any party to introduce a prior inconsistent statement to impeach any witness regardless of by whom the witness may have been subpoenaed or called. To the extent that prior civil cases have held to the contrary, they shall no longer be followed.

### III

Having decided that a party may introduce prior inconsistent statements to impeach his own witness, we must now address the related question of whether prior inconsistent statements can be considered as substantive evidence in civil trials. Missouri generally has followed the orthodox standard that inconsistent statements made by a witness out of court are hearsay and inadmissible for the truth of the matter asserted.

The traditional rule requiring the exclusion of all prior inconsistent statements as substantive evidence is flawed. *See generally, State v. Granberry*, 491 S.W.2d 528, 534, (Mo. banc 1973) (Finch, J., concurring). The United States Court of Appeals for the Second Circuit has observed:

> The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as "pious fraud," "artificial," "basically misguided," "mere verbal rit-

1. Alaska Rule of Evid. 607 (1979); Arizona Rule of Evid. 607 (1977); Arkansas Uniform Rule of Evid. 607 (1976); West Ann.Cal.Evid.Code § 785 (1965); Colorado Rule of Evid. 607 (1979); Delaware Uniform Rule of Evid. 607 (1980); *Davis v. State*, 249 Ga. 309, 290 S.E.2d 273 (1982); Hawaii Rule of Evid. 607 (1980); Illinois Supreme Court Rule 238 (1984) (criminal cases); Iowa Rule of Evid. 607 (1983); Kansas Stat.Ann. § 60–420 (1963); *Tri-City Van & Storage, Inc., v. Slone*, 437 S.W.2d 211 (Ky.1969); Maine Rule of Evid. 607 (1976); Minnesota Rule of Evid. 607 (1977); Montana Rule of Evid. 607(a) (1976); Nebraska Rev.Stat. § 27–607 (1979); Nevada Rev.Stat. § 50–075 (1971); New Mexico Rule of Evid. 607 (1973); North Carolina Rule of Evid. 607 (1983); North Dakota Rule of Evid. 607 (1977); Oklahoma Stat.Ann. tit. 12 § 2607 (1980); South Dakota Comp.Laws Ann. § 19–14–8 (1979); Texas Rule of Evid. 607 (1982); Utah Rule of Evid. 20 (1983); Vermont Rule of Evid. 607 (1983); Washington Rule of Evid. 607 (1978); Wisconsin Rule of Evid. 906.07 (1974); Wyoming Rule of Evid. 607 (1977); Puerto Rico, 32 L.P.R.A.App. IV, R.44(A) (1979); Federal Rule of Evid. 607 (1975).

ual," and an anachronism "that still impede(s) our pursuit of the truth."
*United States v. DeSisto,* 329 F.2d 929 (2nd Cir.1964) (quoting Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 193 (1948)). The chief flaw is that the inconsistent statements of witnesses often are relevant to more than just the credibility of the witness. *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982); *Nugent v. Commonwealth,* 639 S.W.2d 761 (Ky.1982). The inconsistent statement made by a witness may be more reliable and believable than a statement made at trial.

The possible relevance of inconsistent statements can be seen in the facts of the present case. The trial court did not allow the jury to learn of the statements made by Chester Carroll to Officer Overbey. Carroll had told Officer Overbey that he heard the respondent tell a man that he was going to burn his Ford L.T.D. to collect the insurance and buy a four wheel drive automobile. After a meeting between the respondent and Carroll, Carroll denied in his deposition and at trial that he ever overheard the respondent. A reasonable person could find this statement helpful in resolving the truth or falsity of the witness's testimony.

While the majority of jurisdictions have dealt with this question by statute or rule, some have done so by opinion. In *Gibbons v. State,* 248 Ga. 858, 286 S.E.2d 717 (1982), the Supreme Court of Georgia held that prior inconsistent statements may be admitted as substantive evidence when the witness is available for cross-examination. The Georgia court noted that allowing inconsistent statements to be used as substantive evidence has several salutory effects: (1) trial courts will become more adept at determining truth; (2) parties will be partially protected from the erratic witness who changes his story; (3) parties will be protected from the efforts of the other to influence witness testimony; and (4) witnesses will be partially protected from efforts to influence their testimony since the rewards of changing testimony are less.

*Gibbons v. State,* 248 Ga. 858, 286 S.E.2d 717, 722 (1982).

Research regarding human memory indicates several advantages prior inconsistent statements have over trial testimony. Studies have disclosed that the ability to remember an incident declines as time passes. J. Marshall, Law and Psychology in Conflict 29–30 (2d ed. 1980). McCormick explains that "[t]he prior statement is always nearer and usually very much nearer to the event than is the testimony. The fresher the memory, the fuller and more accurate [any statement] is." McCormick, Handbook of the Law of Evidence § 251, at 745 (3d ed. 1984). *See also* 3A Wigmore, Evidence § 1018 (Chadbourn rev. 1970); Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L. Rev. 177, 192 (1948).

Investigations into human recall also have shown that witnesses are more prone to forget facts which support propositions with which they disagree. J. Marshall, Law and Psychology in Conflict 29 (Second Edition 1980). Once a legal dispute is created, the honest recollection of witnesses may change and favor the side they favor. Prior inconsistent statements are not as prone to this phenomenon as trial testimony. Inconsistent statements are often made before a legal dispute has been commenced and they are made sooner after the event when less time has elapsed allowing selective forgetting to operate. Prior inconsistent statements also may be made before a motive for perjury has arisen and perhaps are less likely to be untruthful.

The instruction to jurors to use a prior inconsistent statement only for assessing the credibility of the declarant, but not for the truth of the matter asserted in the inconsistent statement, is at best confusing. The repetitive effect of calling attention to the prior inconsistent statement by the instruction probably cannot do other than highlight the matter in the minds of the jurors thereby making them more inclined to rely on the statement than to disregard it. *See generally* Broeder, The

University of Chicago Jury Project, 38 Neb. L.Rev. 744, 754 (1959).

It has been said that when the declarant is available for cross-examination enough of the dangers of hearsay are absent. *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63, 69 (1982), *cert. denied,* 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 367 (1983); Advisory Committee's Note to Fed.R.Evid. 801(d)(1)(A); Comment, Prior Inconsistent Statements: Conflict Between State and Federal Rules of Evidence, 34 Mercer L.Rev. 1495, 1498 (1983). Wigmore supports the proposition that when the witness is present and subject to cross-examination on his prior inconsistent statements, "[t]he whole purpose of the hearsay rule has already been satisfied." 3A Wigmore, Evidence § 1018 (Chadbourn rev. 1970). Justice Learned Hand asserted: "If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before [is the truth], they are nonetheless deciding from what they see and hear of that person in court." *DiCarlo v. United States,* 6 F.2d 364, 368 (2nd Cir.1925).

The more "sensible and realistic view" and the weight of authority would appear to be to reject the orthodox rule and to view cross-examination of the declarant at trial as sufficient.[2] 2 Jones on Evidence § 10.18 (6th ed. 1972). The Model Code of Evidence and the Uniform Rules of Evidence both allow the use of inconsistent statements as substantive evidence when the declarant is available for cross-examination. Model Code of Evidence Rule 503(b) (1942); Uniform Rule of Evidence 63(1) (1974).

The Federal Rule of Evidence 801(d)(1)(A), as submitted by the United States Supreme Court to Congress, would have allowed a prior inconsistent statement of any witness who was available for cross-examination to be admitted. Report of Senate Committee on the Judiciary to Fed. R.Evid. 801. Out of a political compromise, the present Federal Rule of Evidence arose, with the requirement that for a prior inconsistent statement to be admissible as substantive evidence the inconsistent statement must have been made under oath, in a proceeding, subject to the penalty of perjury. Report of Senate Committee on the Judiciary to Fed.R.Evid. 801. These limitations have been criticized for disregarding the benefits of allowing inconsistent statements to be considered as substantive evidence and the adequacy of cross-examination of the witness at trial. Ordover, Surprise: That Damaging Turncoat Witness Is Still With Us: An Analysis of Federal Rules of Evidence, 607, 801(d)(1)(A) and 403, 5 Hofstra L.Rev. 65 (1976–1977); Graham, Employing Inconsistent Statements For Impeachment And As Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613, and 607, 75 Mich.L.Rev. 1565 (1976–1977).

Nineteen American jurisdictions allow the prior inconsistent statements of a witness to be used substantively where the witness is available for cross-examination.[3] A number of other jurisdictions also admit the prior inconsistent statements as substantive evidence subject to certain limitations.[4] Only a handful of jurisdictions now

---

**2.** Alaska R.Evid. 801(d)(1)(A); Ark.R.Evid. 801(d)(1)(A); Ark.Unif.R.Evid. 801(d)(1)(i) (civil); Cal.Evid.Code § 1235; Colo.R.Evid. 801(d)(1)(A); Del.Code Ann. tit. 11 § 3507(a) (1979) (criminal); *Gibbons v. State,* 248 Ga. 858, 286 S.E.2d 717 (1982); *Patterson v. State,* 263 Ind. 55, 324 N.E.2d 482 (1975); *State v. Holt,* 228 Kan. 16, 612 P.2d 570 (1980); *Nugent v. Commonwealth,* 639 S.W.2d 761 (Ky.1982); Mont.R.Evid. 801(d)(1); Nev.Rev.Stat. tit. 4 § 51.035(2)(a) (1971); N.M.R.Evid. 801(d)(1)(A); N.D.R.Evid. 801(d)(1)(i) (civil); *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982), *cert. denied,* 460 U.S. 1103, 103 S.Ct.

1802, 76 L.Ed.2d 367 (1983); Utah R.Evid. 801(d)(1)(A); Wis.R.Evid. 908.01(4)(a)(1); Wyo. R.Evid. 801(d)(1)(A) (civil); Puerto Rico, 32 L.P. R.A.App. IV, R. 63 (1979).

**3.** *See* Note 2.

**4.** *See e.g.,* Fed.R.Evid. 801(d)(1)(A); Ark.Unif.R. Evid. 801(d)(1) (1975) (criminal only); Fla.Stat. Ann. § 90–801(2)(a) (Harrison 1979); Hawaii R.Evid. 802.1(1); Maine R.Evid. 801(d)(1); Minn.R.Evid. 801(d)(1); Neb.Rev.Stat. § 27–801(4)(a) (1979); N.J.R.Evid. 63(1); N.D.R.Evid. 801(d)(1) (criminal only); Ohio R.Evid.

refuse to permit prior inconsistent statements to be used as substantive evidence.[5] It should be noted that the Missouri Legislature passed a law providing that the prior inconsistent statement of any witness in a criminal trial is substantive evidence. Mo. Rev.Stat. § 491.074 (1985). There has been no evidence from the experience of other jurisdictions that the admissibility of prior inconsistent statements has resulted in any abuse. J. Maguire, Evidence Common Sense and Common Law 63 (1947); McCormick, Handbook of the Law of Evidence § 251 (3d ed. 1984).

■ We believe that only when the declarant is available for cross-examination are enough of the dangers of hearsay and unreliability absent to justify the substantive use of prior inconsistent statements in civil cases. The cause is reversed and remanded for a new trial consistent with this opinion.

HIGGINS, C.J., and FINCH, Senior Judge, concur.

BLACKMAR and DONNELLY, JJ., concur in separate opinions filed.

BILLINGS, J., dissents in separate opinion filed.

RENDLEN, J., dissents and concurs in separate dissenting opinion of BILLINGS, J.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

BLACKMAR, Judge, concurring.

I concur, for the reasons set out in Judge Welliver's thorough opinion, and also for the reasons stated in Judge Finch's concurring opinion in *State v. Granberry*, 491 S.W.2d 528, 533 (Mo. banc 1973).

Two witnesses gave statements to an investigating officer supportive of the defendant's position. When their depositions were taken, both disclaimed their prior statements. The jury well might believe that the initial statements represented the truth and that the disclaimers were the result of subsequent importunities. Yet, by the orthodox rule, these initial statements are unavailable to the trier of the facts. This defendant could not even get the statements into evidence through the back door by claiming surprise, for the disclaimers came before the trial.[1]

After giving careful attention to Judge Billings' eloquent arguments I am persuaded that the disadvantages of the orthodox rule outweigh the advantages and that we should make a change. In so doing we simply perform our duty of developing the common law of evidence.[2] The remonstrance of the Washington Council of Lawyers, quoted in the dissent, reflects the natural conservatism of the legal profession, and raises questions similar to those I raised at the time the Supreme Court's proposed rules of evidence were before Congress.[3] Our ultimate faith, nevertheless, is in the ability of jurors to separate

---

801(D)(1); Okla.Stat.Ann. tit. 12 § 2801(4)(a) (1980); Ore.R.Evid. 801(4)(a)(A); S.D.C.L.Ann. § 19–16–2 (1979); Texas R.Evid. 801(e)(1); Vt. R.Evid. 801(d)(1); Wash.R.Evid. 801(d)(1); W.Va.R.Evid. 801(d)(1)(A).

**5.** *See e.g., Cloud v. Moon,* 290 Ala. 33, 273 So.2d 196 (1973); *Turner v. United States,* 443 A.2d 542 (D.C.1982); *People v. Gant,* 58 Ill.2d 178, 317 N.E.2d 564 (1974); *State v. Ray,* 259 La. 105, 249 So.2d 540 (1971); *Capital Raceway v. Smith,* 22 Md.App. 224, 322 A.2d 238 (1974); *Sims v. State,* 313 So.2d 388 (Miss.1975); Mich. R.Evid. 801(d)(1); *State v. Gomes,* 116 N.H. 113, 352 A.2d 713 (1976); *State v. Sinclair,* 45 N.C. App. 586, 263 S.E.2d 811, revd. on other grounds, 301 N.C. 193, 270 S.E.2d 418 (1980);

*State v. Roddy,* 401 A.2d 23 (R.I.1979); *Martin v. State,* 584 S.W.2d 830 (Tenn.Cr.App.1979).

**1.** Does the orthodox rule sometimes operate to punish the diligent?

**2.** *See, e.g. Pulitzer v. Chapman,* 337 Mo. 298, 85 S.W.2d 400 (1935); (sanctioning the admission of prior sworn testimony which the witness repudiates at trial); *Sutter v. Easterly,* 354 Mo. 282, 189 S.W.2d 284 (1945) (sanctioning the admission of declarations against penal interest as well as those contrary to pecuniary interest).

**3.** Blackmar, "The Proposed Federal Rules of Evidence—How Will They Affect the Trial of Cases?" 27 Washington and Lee L.Rev. 17, 29 (1970).

the sound evidence from the infirm. I opt in favor of giving the jury full information and letting it make the decision. The law of evidence deals in probabilities. Neither certainty nor absence of the possibility of abuse is required as a condition of admissibility.

I do not agree with the assertion that there may be no meaningful cross-examination about a claimed prior inconsistent statement which a witness disavows at trial. (*Cf.* concurring opinion of Judge Seiler in *Granberry*, 491 S.W.2d at 532, and Judge Billings' similar arguments). Cross-examination is not simply an effort to get a witness to disaffirm his testimony. There is ample room for exploration. Does the witness deny making the statement, or does he profess lack of memory? Did he initiate the conversation or was he questioned? Was he in a position to observe? If the witness admits making the earlier statement, he may explain the inconsistency. If he does not, then the person reporting the statement is subject to cross-examination. The surrounding circumstances may be fully explored so that the jury may be better enabled to determine where the truth lies.

One of my earlier concerns was as to whether an essential element of a case could be established simply by a prior statement of a witness which the witness repudiates at trial. The Washington Council of Lawyers expresses similar concern. Missouri, however, disclaims the *scintilla* rule [4] and holds that every element of a case must be established by substantial evidence.[5] So the courts do not have to countenance the submission of wholly unsubstantial cases to juries.

The enactment of Senate Committee Substitute for House Committee Substitute for House Bills 366, 248, 372 and 393, 83rd General Assembly, represents a recognition

that prior inconsistent statements of a witness who is present at trial have value as evidence. I do not find, in that bill's limitation of the change to certain chapters of the criminal statutes, an affirmative policy of maintaining the orthodox view elsewhere. It is absolutely unnecessary, moreover, to deal with the problem of face to face confrontation in criminal cases as expounded by Judge Donnelly.[6]

I concur in reversal and remand.

DONNELLY, Judge, concurring.

In *Pulitzer v. Chapman*, 337 Mo. 298, 85 S.W.2d 400 (1935), this Court followed the weight of existing authority in holding that extrajudicial statements not made by a party to the suit were hearsay and not admissible. The Court stated:

> It is true the rule generally is said to be that prior contradictory statements of a witness may be shown only for the purpose of impeachment. The reason assigned, where any is given, is that if such statements were taken as proof of the facts stated, the testimony would be hearsay.

*Pulitzer v. Chapman, supra,* 85 S.W.2d at 410 (citations omitted). However, the Court then held that prior contradictory statements made during a deposition were not hearsay and could be admitted as substantive evidence. This was an innovation when decided, but it was reasoned that the requirements of the hearsay rule were met because the prior statement was made under oath and subject to cross-examination. The Court declined to set down a rule that would extend beyond the facts of the case to extrajudicial statements, but noted that the opinion went beyond the general rule and some authority supported "going even further." *Pulitzer v. Chapman, supra,* at 411.

---

**4.** *Hardwick v. Kansas City Gas Co.,* 352 Mo. 986, 180 S.W.2d 670 (1944); *Boring v. Kansas City Life Insurance Company,* 274 S.W.2d 233 (Mo. 1955).

**5.** *Jones v. Garney Plumbing Company,* 409 S.W.2d 637 (Mo.1966).

**6.** In *State v. Griffin,* 662 S.W.2d 854 (Mo. banc 1983), this Court sanctioned a broad expansion of the "excited utterance" rule in a capital case, so as to admit very damaging, unconfronted testimony.

In 1973, this Court was presented for the first time with the question of whether prior inconsistent statements made during a deposition could be used as substantive evidence as well as for impeachment in a criminal case. *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973). In *Granberry*, we determined that such statements were admissible as substantive evidence of a criminal defendant's guilt but were careful to articulate our belief that the interests of the *public* and the *accused* would be better served and protected by preserving the *basics* of the *orthodox* view. *Granberry, supra* at 531. It now appears that almost all jurisdictions have adopted our position in *Pulitzer* and *Granberry* and allow prior statements made during a deposition to be used as substantive evidence. In both civil and criminal cases a majority of these jurisdictions also have extended the rule to encompass extrajudicial statements where the witness is present at trial and subject to cross-examination. I believe that it is now time to take the next logical step from *Pulitzer in civil cases* and allow prior inconsistent statements to be used both for impeachment and for substantive evidence where the witness is at trial and subject to cross-examination by either party.

However, in my view, admission of prior inconsistent statements as substantive evidence in criminal cases would violate the Missouri Constitution, Article I, Section 18(a) which provides: "That in criminal prosecutions the accused shall have the right * * * to meet the witnesses against him face to face * * *."

The Court's opinion today adopts the modern trend rule in civil cases as a *policy choice* after weighing the usual reasons for excluding hearsay against "the theory that the usual dangers of hearsay are largely nonexistent where the witness testifies at trial." *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). Whether the *orthodox rule* should be abandoned in criminal cases involves not only a policy determination, but more importantly a determination of its effect on our Constitution's guarantee that an ac-

cused shall have the right to meet his accusers "face to face."

In considering this latter question, it is appropriate to note that the United States Supreme Court has indicated that the application of the rule we adopt today to criminal cases would not violate an accused's *federal* constitutional right "to be confronted with the witnesses against him * * *." U.S. Const., amend. VI; *California v. Green, supra*. In *Green*, the Court stated:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law.

399 U.S. at 155, 90 S.Ct. at 1933–34.

The Supreme Court upheld the use of out-of-court statements where the declarant was available at trial "and subject to full and effective cross-examination," 399 U.S. at 158, 90 S.Ct. at 1935, because it found the underlying intent of the Sixth Amendment Confrontation Clause was "to prevent depositions or *ex parte* affidavits * * * being used against the prisoner in lieu of a personal examination and cross-examination of the witness * * *." 399 U.S. at 157, 90 S.Ct. at 1935, quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

This finding, as Justice Harlan's concurrence emphasizes, results from an examination of the historical evidence surrounding the framing of the Sixth Amendment. 399 U.S. at 174–180, 90 S.Ct. 1943–1946 (Harlan, J., concurring):

> From the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses. *That the Clause was intended to ordain common law rules of evidence with constitution-*

*al sanction is doubtful*, notwithstanding English decisions that equate confrontation and hearsay. Rather, having established a broad principle, it is far more likely that the Framers anticipated it would be supplemented, as a matter of judge-made common law, by prevailing rules of evidence.

*Id.* at 179, 90 S.Ct. at 1946. (Emphasis added.)

However, *Green* sheds little light when we turn to the Constitution of Missouri. Its guarantee "That in criminal prosecutions the accused shall have the right * * * to meet the witnesses against him face to face * * * *" has existed unchanged since the Constitution of 1820. Mo. Const.1820, art. XIII, sec. 9, Mo. Const.1865, art. I, sec. XVIII, Mo. Const.1875, art. II, sec. 22, Mo. Const.1945, art. I, sec. 18(a). It was early recognized that this language derives from the biblical account of St. Paul's prosecution before the Roman governor Festus, who recounted:

> the chief priests and the elders of the Jews gave information about him, asking for a sentence against him. I answered them that it was not the custom of the Romans to give up any one before the accused met the accusers *face to face* * * *.

Acts 25:15–16 (Revised Standard Version 1971) cited in *State v. McO'Blenis*, 24 Mo. 402, 412 (1857).

And it was in *McO'Blenis* that this Court first contoured our Constitution's right of confrontation:

> The great security of the accused * * is in the fundamental principle of the common law, *that legal evidence consists in facts testified to by some person who has personal knowledge of them; thus excluding all suspicions, public rumors, second-hand statements, and generally all mere hearsay testimony, whether oral or written, from the consideration of the jury* * * * The people have incorporated into their frame of government a great living principle of the common law under which they and their ancestors had lived, and it is the

duty of the court so to construe it as to make it effectual to answer the great purpose they had in view. And this principle, we think, is no other than the principle of the common law in reference to criminal evidence *that it consists in facts within the personal knowledge of the witness, to be testified to in open court in the presence of the accused.* * * * It is not, however, a *stiff, unbending rule*, extending to every case without exception, falling within its letter, but is limited and controlled by subordinate rules, which render it safe and useful in the administration of public justice, and are as well established as the great principle itself, which, with all its exceptions and limitations, was taken from the existing law of the land and incorporated into the Constitution. The purpose of the people was not, we think, to introduce any new principle into the law of criminal procedure, but to secure those that already existed as part of the law of the land from future change by elevating them into constitutional law. (Emphasis in original.)

24 Mo. at 414–416.

This understanding of our Constitution has endured through succeeding generations and is alive today, even after three revisions of our Constitution. Indeed, the constitutional prohibition against hearsay was understood to be so strict in 1945, when our current Constitution was adopted, that the framers deemed it necessary to enact an amendment to secure the admissibility of pretrial depositions taken outside the context of a preliminary hearing. It is especially important to note the extensive convention debate that accompanied the adoption of Mo. Const.1945, art. I, § 18(b).

Unlike the final adopted amendment, the Committee Report left to the legislature the definition of the State's power to take such depositions, stating:

> Provisions may be made by law to provide for the taking of depositions within or without the state in all criminal causes and for the use thereof at any

trial, provided that where such depositions are taken by the state, the right of personal confrontation and cross-examination of the witness by the accused shall be carefully preserved * * *.

6 Debates of the Missouri Constitution 1945, 1531 (hereafter *"Debates"*). Senator Cope interposed an amendment striking out all of the proposed amendment objecting that:

> *The all important thing in the trial of any case is for the jury to see the witness who is testifying,* to study his countenance, study something about the character of the man so that they can, themselves, make up their minds whether to believe or disbelieve the testimony which the witness gives.

*Id.,* at 1533 (emphasis added).

In support of Senator Cope's amendment to strike the deposition provision, Senator Williams argued to the inconsistency of the proviso of the Committee Report that the accused's rights of confrontation and cross-examination "be carefully preserved":

> There is a difference between that [the confrontation "carefully preserved"] and the confrontation which the law affords to the accused in a court. *There is only one place where confrontation can take place, and that is in a court where the trial takes place. Where the judge presides and where he is charged by law with the duty of seeing that the accused is protected* in all of his rights as well as the state and society protected in all of their rights. So that the very use of the term "personal confrontation" recognizes a distinction and attempts to get around a definite right prescribed by the Constitution itself.

*Id.* at 1565 (emphasis added).

The original committee recommendation was rejected with the approval of Senator Cope's amendment to strike. Two reasons appear from the record of the debates: those reservations discussed above with respect to an accused's rights and the impracticality of the amendment's extra-territorial scope. *See,* 6 *Debates* 1571 (Remarks of Mr. Mayer).

Thereafter a proposal was submitted that eventually became what is now Article I, § 18(b), which states:

> Upon a hearing and finding by the circuit court in any case wherein the accused is charged with a felony, that it is necessary to take the deposition of any witness within the state, other than defendant and spouse, in order to preserve the testimony, and on condition that the court make such orders as will fully protect the rights of personal confrontation and cross-examination of the witness by defendant, the state may take the deposition of such witness and either party may use the same at the trial, as in civil cases, provided there has been substantial compliance with such orders. The reasonable personal and traveling expenses of defendant and his counsel shall be paid by the state or county as provided by law.

The limited scope of this amendment bears emphasis. First, a deposition may only be taken upon a *hearing* before the circuit court. Second, a deposition may only be taken in a *felony* case. Third, the witness must be within the state. Fourth, the defendant's spouse may not be deposed. Fifth, the court must find that the deposition is necessary to *preserve* testimony. It may not, therefore, be used at trial unless the witness is dead or outside the jurisdiction. Sixth, the court must make orders protecting the accused's rights to confrontation and cross-examination, which orders must be substantially complied with. Finally, the State must pay the reasonable personal and travel expenses of the accused *and* his counsel.

The limitations and protections in the amendment are so detailed that the proposal was objected to during the Convention on the ground that it was in the nature of legislation and inappropriate for inclusion in a constitution. *See, e.g.,* 7 *Debates* 1905–1906 (Remarks by Governor Park). Nevertheless, this narrowly tailored exception to the strict common law protections embodied in our Constitution prevailed over attempts to broaden legislative authority to

define an exception. This reluctance on the part of the Constitutional Convention to countenance a tampering with the long-established protections indicates that no other change in the traditional rule was contemplated or effected. The scope of our Constitution's guarantee that an accused must meet witnesses against him face to face continues to be as this Court held in *McO'Blenis:*

> The purpose of the people was not * * to introduce any new principle into the law of criminal procedure, but to secure those that already existed * * * from future [legislative or judicial] change by elevating them into constitutional law.

*McO'Blenis, supra,* at 416.

Furthermore, whether the continuing vitality of the ancient common law rules "be wise or unwise, is not submitted to our judgment. [The common law rules] were well established at the time, and * * * went into the Constitution as part of the * * * clause now under consideration." *Id.* at 417.

The foregoing indicates that the Missouri Constitution preserves against legislative or judicial modification the panoply of the common law proscriptions against hearsay in criminal cases. Unlike the Federal Constitution, which did not codify the common law of hearsay, we have longstanding and venerable precedent to the contrary.

The full extent of the dangers posed by applying the rule adopted today to criminal cases may be seen in *State v. Gorden,* 356 Mo. 1010, 204 S.W.2d 713 (1947). There, the only evidence adduced at trial consisted of the contents of the prosecutrix's prior unsworn statement and a signed, but unsworn, statement made by the accused wherein he confessed committing the offense. This Court reversed the conviction holding the admission of the prosecutrix's statement unconstitutional and barring the confession as unsupported by an independent *corpus delicti.* Assume that there had been no confession. If today's rule were applied in such a case, the accused could be convicted solely by the contents of the extrajudicial statement.

It is of little consolation to such an accused to say that he may cross-examine the witness at trial as to the prior statement. It would be impossible to recapture, at that late date, the demeanor and appearance of the witness at the time of the declaration. Yet, it is precisely those observations that are critical to evaluating the credibility of the *statement.* But not only is it important for the jury to see the witness, it is equally important for the witness to see the jury and confront the accused when he makes damning testimony. It is only then that he can fully appreciate the impact of his words and properly contemplate their ultimate consequences for human life and liberty.

My present view is that neither this Court nor the General Assembly (§ 491.-074, Laws of Mo.1985 notwithstanding) has power to abrogate the common law protections given constitutional stature by Mo. Const. art. I, § 18(a).

I concur.

BILLINGS, Judge, dissenting.

In one fell swoop, and relying in the main on *codes* of evidence enacted by legislatures or courts with the requisite rule making authority, all from other jurisdictions, or model *codes,* modified and amended from jurisdiction to jurisdiction and sometimes rejected *in toto,* plus treatises which have been rejected time and time again over the years by this Court, the principal opinion, by plain old-fashioned *judicial legislation,* and contrary to the Constitution of Missouri, adopts two new rules of evidence.

If the principal opinion had been as thorough in researching Missouri law as it was eager to engage in naked judicial legislation, it would have discovered that under Missouri's common law rule governing the impeachment of a party's own witness, a witness will not be permitted to obscure or prevent the emergence of truth. Because I firmly believe that Missouri's common law rule operates fairly and effectively and in no way impedes the ascertainment of truth;

and because I also believe that the use of any prior inconsistent statement as substantive evidence will very much impede the ascertainment of truth, I respectfully dissent.

Preliminarily, I wish to point out that the principal opinion's imperceptive and seemingly unquestioning support for a common law rule that gives a party the unrestricted right to impeach his own witness is intimately connected to the misguided theory that *any* prior inconsistent statement should be deemed substantive evidence if the declarant is presently available for cross-examination. This being so, I direct my remarks first to the general question of whether any prior inconsistent statement should be used as substantive evidence when the declarant is available for cross-examination at the time the prior statement is sought to be admitted into evidence.

When Congress conducted hearings on the Proposed Federal Rules of Evidence, they wisely solicited the views of dozens of leading lawyers, respected jurists, law professors and professional associations. Mr. Herbert Semmel, representing the Washington Council of Lawyers,[1] directed part of his testimony to the Advisory Committee's version of Rule 801(d)(1)(A), which as then proposed, would have made any prior inconsistent statement non-hearsay and thus, admissible as substantive evidence. Mr. Semmel articulated with chilling eloquence the unreliability of and dangers inherent in coloring any prior inconsistent statement as substantive evidence.

There are substantial dangers in allowing any prior inconsistent statement to be introduced in evidence.

1. Inaccurate repetition of oral statements made months or years before the trial.

2. Misleading statements subject to unintended interpretations made when the witness had no appreciation for the necessity for accurate reporting.

3. Incomplete statements leading to unintended meaning, made when the witness had no appreciation for the necessity of complete reporting.

4. Inaccurate or unintended statements made by a witness as a result of suggestion or coercion.

Trials occur months and often years after the events sought to be recreated at trial. Memory lapses are an obvious problem in the trial process. The problem becomes more acute when a witness tries to repeat what are often casual remarks by another person at a time when the listener may not have even been aware of the importance of the remarks or that he will later be called upon to repeat them. Moreover, people often hear what they want to hear and remember what they want to remember. A perfectly "honest" witness who favors one party to a lawsuit may have a distorted memory of what a witness for the other party said months or years before trial. And, of course, there are cases of out-right perjury by one witness testifying as to prior statements by an earlier witness. These dangers are not entirely alleviated because both the principal witness and the secondary witness, who testifies as to the former's alleged inconsistent statements, are both present at trial and available for corss-examination [sic]. The jury becomes diverted from the principal issues of the case to collateral questions of what one witness said on a prior occasion.

Many seemingly inconsistent statements are the result of casual comments made by persons who are unaware of the significance which may later be attached to these remarks. The comment may be incomplete; details are omitted which were unimportant to the declarant at the time but which may be crucial at a trial. Language may be employed in a loose, ambiguous manner which later aapears [sic] contradictory to testimony at trial. An observation may be conclusory. Or

---

1. The Washington Council of Lawyers was a voluntary association of over 400 lawyers engaged in private practice, government employ-

ment and the teaching of law. It drew its membership from the Washington, D.C. area.

the declarant may have indulged in the very human tendency to subconsciously fill in the details where only a portion of an observed event remains in the memory.

The problems of inaccurate repetition, ambiguity and incompleteness of out-of-court statements may be found in both written and oral statements, although the problem is more acute in oral statements. But written statements are also subject to distortion. We are all familiar with the way a skilled investigator, be he a lawyer, police officer, insurance claim agent, or private detective, can listen to a potential witness and then prepare a statement for signature by the witness which reflects the interest of the investigator's client or agency. Adverse details are omitted; subtle changes of emphasis are made. It is regrettable but true that some lawyers will distort the truth to win a case and that some police officers will do the same to "solve" a crime, particularly one which has aroused the public interest or caused public controversy. Or the police officer may be seeking to put away a "dangerous criminal" who the officer "knows" is guilty but ngnist [sic] whom evidence is lacking. Examples of such conduct sometimes become public and undoubtedly represent the tip of the iceberg. The latest of such incident was reported in the **New York Times** of June 2, 1974, revealing testimony by a New York policeman who admitted perjury in courtroom testimony on a number of occasions to cover up illegal wiretaps.

The potential witness may very well sign a distorted statement. He may have little interest in whether it is accurate or he may not perceive the significance of an omission or a change. He may sign what is put before him out of a genuine desire to cooperate or out of fear of reprisals if he objects. Witnesses in criminal cases often are those who themselves have police records, are awaiting sentencing, or are on probation or parole. The Supreme Court in its current Term has again emphasized the danger that such witnesses may tailor their statements or testimony to appease the police or even to divert suspicion from themselves to others. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

*It is one thing to admit such extra-judicial statements for impeachment purposes and quite another to allow a finding of guilt or a determination of liability or non-liability to rest on such statements.* Use of prior inconsistent statements to impeach is an inherent part of the adversary system. Each party may make its own judgment as to whether the value of a witness's [sic] testimony at trial will be outweighed by adverse consequences when a prior inconsistent statement is introduced to impeach. On the other hand, under the Rules as proposed by the Advisory Committee and pronounced by the Supreme Court, any party to litigation could call a witness whose testimony at trial might be vague, incomplete or who might even be unable to recall the events in issue after the passage of considerable time. At that point, any prior statement, oral or written, inconsistent with testimony at trial could be introduced as substantive evidence. (Proposed Federal Rules of Evidence, promulgated November 20, 1972, Rule 801(d)(1)(A)). In theory, a criminal conviction or civil liability could rest solely on such evidence. (Emphasis ours.)

Statement of Herbert Semmel,[2] Hearings on H.R. 5463, Before the Senate Committee

---

**2.** It should be noted that Mr. Semmel did express support for the version of Rule 801(d)(1)(A) which is presently embodied in the Federal Rules of Evidence. The current Rule only admits as substantive evidence those prior inconsistent statements which are inconsistent with the declarant's testimony and which were given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition. And, in addition, the declarant must presently be available for cross-examination.

These protective measures serve to guard against the very real danger of exposing a jury to an unfiltered stream of fabricated prior inconsistent statements. The following jurisdic-

on the Judiciary, 93d Congress, 2d Sess. at 302–03 (1974).

The principal opinion suggests that these dangers are rendered harmless if the declarant is available for cross-examination at the time the prior inconsistent statement is offered for admission into evidence. In *State v. Granberry*, 491 S.W.2d 528 (Mo. banc 1973)[3], five members of this Court refused to adopt the position advanced today by the principal opinion. I submit that the position taken by the principal opinion elevates theory over the demanding realities of litigation and grossly underestimates the crucial role that timely cross-examination has in the search for truth.

The essential importance of the hearsay rule was noted by Professor Wigmore in his exhaustive treatise. Wigmore described the common law rule prohibiting the use of hearsay as "that most characteristic rule of the Anglo-American Law of Evidence—a rule which may be esteemed, next to jury trial, the greatest contribution of that eminently practical legal system to the world's method of procedure." 5 Wigmore, Evidence § 1364 (Chadbourn rev. 1974).

Hearsay is excluded from admission into evidence primarily because it has not been subjected to the penetrating heat of an effective cross-examination. A cross-examination which is postponed and stale simply cannot substitute for one which is fresh and immediate. The disparity between the former and the latter was delineated with unparalleled cogency and insight by the

Michigan Supreme Court in *Ruhala v. Roby*, 379 Mich. 102, 150 N.W.2d 146 (1967).

*Ruhala* involved a witness to an automobile accident who at the scene of the accident stated that he saw a man driving the car. The estate of a woman killed in the accident, the plaintiff, filed an action and at trial the witness was going to testify that the woman was driving. The plaintiff sought to introduce the prior inconsistent statement and rely upon it as substantive evidence. The trial court excluded the statement for its substantive value and the Michigan Supreme Court affirmed. In so holding, the court made the following observations concerning the utility of postponed cross-examination:

> Cross-examination presupposes a witness who affirms a thing being examined by a lawyer who would have him deny it, or a witness who denies a thing being examined by a lawyer who would have him affirm it. Cross-examination is in its essence an adversary proceeding
>
> \* \* \* \* \* \*
>
> ... If [a witness] refuses to adopt his prior statement as true, there can be no adversary cross-examination upon it. If he refuses to affirm, no question can be put to him which would shake his own confidence in his affirmation.
>
> \* \* \* \* \* \*

The would-be cross-examiner is not only denied the right to be the declarant's adversary, he is left with no choice but to

---

tions, *either by legislative act or by court rule,* have wisely decided to incorporate the prophylactic measures embodied in Fed.R.Evid. 801(d)(1)(A). *See e.g.,* Ark.R.Evid. 801(d)(1) (criminal only); Fla.C.Evid. § 90–801(2)(a) (Fla. Statutes, 1981); Hawaii R.Evid. 802.1(1)(A); Iowa R.Evid. 801(d)(1)(A); Me.R.Evid. 801(d)(1)(A); Minn.R.Evid. 801(d)(1)(A); Neb. Rev.Stat. § 27–801(4)(a) (1979); N.D.R.Evid. 801(d)(1)(i) (criminal only); Ohio R.Evid. 801(d)(1)(a) (the prior statement must have been subject to cross-examination by the party against whom it is being offered); Okla.Stat. Ann. tit. 12, § 2801(4)(a) (1980); Or.R.Evid. 801(4)(a)(A); S.D.Comp.Laws Ann. § 19–16–2 (1979); Tex.R.Evid. 801(e)(1)(A); Vt.R.Evid. 801(d)(1)(A); Wash.R.Evid. 801(d)(1)(i); Wyo-

ming R.Evid. 801(d)(1)(A) (criminal only); W.Va.R.Evid. 801(d)(1)(A).

3. *Granberry* is good authority for the proposition that Missouri rejects the use of prior inconsistent statements as substantive evidence. However, in 1935 in *Pulitzer v. Chapman*, 337 Mo. 298, 85 S.W.2d 400 (banc 1935), this Court created a very narrow exception to the general rule. The exception applies only where a witness testifies at trial and has given a deposition at which he was under oath and subject to cross-examination. *Pulitzer* has limited utility beyond the circumstances set forth in the opinion. Additionally, a deposition taken in compliance with Mo. Const. art. I, § 18(b) can be used as substantive evidence. *See Granberry, supra* at 531.

become the witness' friend, protector and savior.

*Id.* at 156.

The court went on to state further that "no matter how deadly the thrust of the cross-examiner, the ghost of the prior statement stands." *Id.* at 157.

I wholly subscribe to Professor Wigmore's view that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, Evidence, § 1367 (Chadbourn rev. 1974). However, if this great legal engine for the discovery of truth is allowed to run out of time and with a better late than never attitude, I fail to see how it can any longer be depended upon to consistently satisfy the purpose of the hearsay rule. For all of these reasons, I cannot subscribe to the principal opinion's view that any prior inconsistent statement should be relied upon for its substantive value if the declarant is presently available for cross-examination.

Remaining is the question of whether Missouri's common law rule prohibiting a party from impeaching his own witness—absent entrapment, surprise or hostility—has continued vitality and purpose. There can be little debate over the fact that Missouri's common law rule is of ancient origin. Notwithstanding this fact, the rule, as it has been developed and applied by Missouri's courts over the past 131 years,[4] has evolved into an effective and useful modern evidentiary principle—which has proven successful in accommodating the realities of litigation while safeguarding the integrity of our primary means of searching out the truth.

It is true that the traditional rationale offered in support of the common law rule—that a party vouches for his witness-es—has been discredited and no longer has a secure place in modern jurisprudence. However, even a cursory examination of this Court's most recent decisions involving this issue would reveal the obvious absence of this rationale. *See State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985); *State v. Armbruster*, 641 S.W.2d 763 (Mo.1982); *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977); *State v. Renfro*, 408 S.W.2d 57 (Mo.1966); *State v. Gordon*, 391 S.W.2d 346 (Mo.1965).

Despite the rule's primitive beginnings, Missouri's courts have steadfastly refused to give it a primitive application. In 1906 in *Beier v. St. Louis Transit Company*, 197 Mo. 215, 94 S.W. 876 (1906), this Court—in connection with the application of Missouri's common law rule—declared that "the law has nowhere shown greater wisdom than in refusing to lay down a hard and fast rule to be followed ... [by] ... leaving to the trial judge the exercise of a wise discretion to be applied to suit the varying conditions presented to him ..." *id.* at 235, 94 S.W. at 882. *Accord Mooney v. Terminal R. Ass'n*, 352 Mo. 245, 176 S.W.2d 605 (1944); *Crabtree v. Kurn*, 351 Mo. 628, 173 S.W.2d 851 (1943); *Dauber v. Josephson*, 209 Mo.App. 531, 237 S.W. 149 (1922).

The precise contours of the rule proceed along the following lines. Under the rule, a party may not impeach his witness if the witness' testimony merely fails to meet the expectations of the party. However, if the witness should suffer from a faulty memory, the rule allows the party, "for the purpose of refreshing his memory, to direct the attention of [the] witness to statements previously made by him as to the subject

---

**4.** Missouri's common law rule made its first appearance in Missouri's reported jurisprudence in 1854 in the case of *Brown v. Wood*, 19 Mo. 475 (1854). *Brown* was an action for labor and materials in which the plaintiff attempted to establish an agency between defendant and the defendant's brother—who was called as a witness by plaintiff. The witness' testimony failed to establish the agency and plaintiff sought to impeach him by introducing a written doc-ument, but was precluded from doing so by the trial court. Without much elaboration, this Court affirmed the action of the trial court and held that a party cannot impeach his own witness. *Id.* at 476.

Despite the prohibition of the rule, the Court did point out that "the fact may be proved by another witness, although the first witness will thereby be impliedly discredited." *Id.*

matter of his testimony...." *Brown v. Chicago, R.I. & P.R. Co.,* 315 Mo. 409, 286 S.W. 45 (1926). Furthermore, the rule would not prevent a party from exhibiting to his witness, for the purpose of refreshing his memory, a former written statement made by the witness. *State v. Renfro, supra,* at 59.

Moreover, the rule has no application when a party calls his adversary as a witness. *Wells v. Goforth,* 443 S.W.2d 155, 160 (Mo. banc 1969). In *Wells* we held that an adverse party called as a witness under § 491.030, RSMo 1959 [now found at § 491.030, RSMo 1978] may be impeached by prior inconsistent statements. In connection with this principle, *Wells* expressly overruled *Chandler v. Fleeman,* 50 Mo. 239 (1872), which held that Missouri's rule prohibiting impeachment of a party's own witness applied with equal force when the witness is the adverse party.

Missouri's common law rule does not operate to preclude a party from impeaching his own witness when the witness' testimony results in surprise to or entrapment of the party. *State v. Byrd, supra* at 502. The concept of entrapment speaks to improprieties on the part of either the witness or the adverse party. It also encompasses collusion. *Beier v. St. Louis Transit Company, supra* 197 Mo. at 235, 94 S.W. at 882.

The separate element of surprise covers the situation where a party calls a witness expecting the witness to give favorable testimony and is genuinely surprised and damaged by the witness' unexpected and unfavorable testimony. *Malone v. Gardner,* 362 Mo. 569, 582, 242 S.W.2d 516, 523 (1951). Additionally, the rule permits a party to impeach his own witness when the witness is truly hostile to the party calling him. *Mooney v. Terminal R. Ass'n, supra* 352 Mo. at 260, 176 S.W.2d at 611. In *Mooney* this Court recognized that this exception to the general rule applies with even greater purpose when the party has no alternative but to call the witness. *Id.* at 260, 176 S.W.2d at 611. Accompanying each of the exceptions just delineated is the requirement that a party must have suffered actual affirmative damage as a result of the witness' testimony. *Crabtree v. Kurn, supra* 351 Mo. at 647, 173 S.W.2d at 859.

Missouri's common law rule which denies a party the unrestricted right to impeach his own witness does have continued vitality and purpose. It prevents a party from setting up straw men solely for the purpose of knocking them down before an impressionable jury and it prevents a party from bringing in through the back door unreliable hearsay evidence which would not be allowed admission through the front door. Giving a party the unfettered right to impeach his own witness will serve only to expose the jury to an unending flood of hearsay.

Finally, it should not go unnoticed that a convincing majority of the jurisdictions identified by the principal opinion as having addressed the issues under consideration in the present case did so by legislation or by court promulgated rule. Only two of the thirty jurisdictions cited by the principal opinion in footnote 1, supporting its position on the question of whether a party should have the unrestricted right to impeach his own witness, acted by way of judicial decision. The other twenty-eight jurisdictions addressed the question legislatively or by court rule. This latter course of action, however, is not available to us because Mo. Const. art. V, § 5 prohibits this Court from promulgating rules of evidence.

In connection with the question of whether any prior inconsistent statement should be used for its substantive value, only five of the thirty-five jurisdictions cited by the principal opinion in footnotes 2 and 4 as having modified or abandoned the common law rule did so by judicial decision. This past legislative session, the Missouri General Assembly passed a legislative act, that was signed by the Governor on July 19, 1985, which allows "a prior inconsistent statement of any witness testifying in a criminal trial under the provisions of chapters 565, 566, or 568, RSMo, [to] be received as substantive evidence...." CCS for SCS for HCS for H.B. 366, 248, 372 and 393, 83rd General Assembly, 1st Regular Session (1985). The fact that the legisla-

ture has begun to act in the criminal area, but has not yet acted in the area of civil litigation does not justify this Court donning its legislative hat. Moreover, the recent action taken by the Missouri General Assembly in this area of the law clearly demonstrates that the modification of Missouri's law of evidence is a matter which lies more appropriately within the province of the legislature.

It would be all but too easy for this Court to legislate under the guise of deciding cases and controversies if we allowed ourselves to take up every matter the legislature has not yet acted upon. The result of such unrestrained and ill-advised judicial activism would be a hodgepodge of common law rules and statutory enactments—which would bring us no closer to a thorough and comprehensive treatment of our law of evidence. In this complex area of the law, which clamors for legislative attention, the orderly administration of justice dictates deference to rather than usurpation of the legislative process.