**Hubert SEWELL, Respondent,**

v.

**BELGER CARTAGE SERVICE, Appellant.**

**No. WD 37582.**

Missouri Court of Appeals, Western District.

Oct. 7, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 25, 1986.

Robert B. Reeser, Jr., and Adam Fischer, Sedalia, for appellant.

Gordon Gaebler, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and MANFORD and GAITAN, JJ.

MANFORD, Judge.

This is an appeal from a jury-tried case which resulted in a judgment for plaintiff (respondent herein) on his claim for damages for injuries allegedly caused by the negligence of defendant Belger Cartage Service, Inc.[1] Plaintiff's injury occurred when he stepped into an open and uncovered press pit located in an area under construction on the premises of his employer, Royal Industries.

Reversed and remanded with directions.

Appellant raises two points which charge, in summary, that the trial court erred (1) in overruling its motions for directed verdict and for judgment notwithstanding the verdict because the evidence was insufficient to make a submissible case, and (2) in giving Instruction No. 5

---

1. Respondent's petition alleged negligence on the part of appellant as well as Henningsen Steel Products Co., Inc., Wayne Carter, and Haggard Hauling and Rigging, Inc. All defendants, save appellant, were dismissed by respondent prior to trial. This appeal involves only the claim against appellant.

because said instruction failed to require a finding on each element of fact essential to make a submissible case.

Since appellant challenges the sufficiency of the evidence, a detailed account of the testimony is required:

Plaintiff's first witness was one Wayne Carter who testified that he was a builder specializing in concrete work. Carter stated that in 1974, he was employed in connection with the expansion of Royal Industries. He testified that during the summer of 1974, he laid a concrete pad, approximately 180 feet by 91 feet, on the project site, and that in so doing, he blocked out an 8 by 10 or 8 by 12 foot portion (an area kept open and free from concrete) on the concrete pad surface. The depth of the blockout was the thickness of the concrete pad, or approximately 8 inches. Subsequently, Carter dug out the blockout to a depth of 30 or 36 inches, and lined the interior of the hole with concrete. The hole was constructed as a press pit, its ultimate purpose being to contain air bags or hydraulic equipment over which a punch press is placed. This blocked-out area is referred to as a press pit.

Carter testified that while he was on the project site, he observed a company named Haggard deliver a 260 pound (ton) punch press, but he did not see anyone remove the press from the truck or otherwise place it anywhere on the concrete pad.

Carter also stated that he was not aware that Belger Cartage did any work at the project site on weekends during 1974.

On cross-examination, Carter testified that he vaguely remembered giving a statement during March of 1978 about the incident in question and, after being allowed by defense counsel to examine a copy of the alleged statement, Carter stated that the exhibit refreshed his recollection with regard to the incident in question. Reading from the exhibit, defense counsel asked Carter if he was asked, "Did you help in any way when the machine was set on the pad?", and if he had answered, "No. I was there when the machine was unloaded off the truck just watching, Haggerty did it."

Carter responded, "Yes, I think so." The testimony continued:

Q. (by defense counsel Gaebler) And then were you asked: "You were there when the machine was unloaded?" And you answered: "Yes. Well, I was just watching, I wasn't there all the time but I come over to watch them. They had a big crane in there." And then you were asked again, were you not, sir: "Do you remember whether the covering was over the hole at that time?" Answer: "No I don't, I couldn't tell you." Question: "Okay, but they set it down right by the hole?" Answer: "Yes. They set it down right by the side of it because we had a little, some filler concrete to block out was bigger than the machine pad, you know it wasn't as big, their pads and they set it on part of that and I know it broke it, it's still broken." Do you remember those answers?

A. I remember that pad. Now, I don't remember them setting it down. I remember the machine there and it broke the pad. Because the blockout was bigger than the machine hole, than the machine pad was, and that was a 4–inch rim of concrete.

Q. And who are the "they" in this answer that you are referring to when you talk about "they set it down right by the hole," is that Haggerty?

A. Well, that's who I figured did it. I seen Haggerty unloading it.

Q. Okay.

A. I remember I seen Haggerty's truck there.

Q. And when we are talking about Haggerty, is that—

A. Haggard.

Q. —Haggard Heavy Hauling?

A. Yes.

    *     *     *     *     *     *

Q. And you didn't see Belger Cartage?

A. No, I didn't.

Q. And Belger Cartage didn't unload this press and place it next to the hole, did they?

A. I don't know.

Q. You didn't see them?

A. I didn't see them.

Q. Who did you see?

A. I didn't see anybody set it by the hole, but I seen it by the hole after it was there.

The statement from which defense counsel had read was later admitted into evidence over the objections of plaintiff's counsel.

Finally, Carter testified that during the time he was working at the project site he had never signed for any deliveries of equipment from Belger Cartage, nor had he ever seen any equipment or men from Belger Cartage.

On re-direct, Carter again stated that he saw Haggard unload the press but that he did not see who moved the press onto the concrete pad. Carter further testified that when he had finished work on the press pit he covered the hole with four by eight plywood.

On re-cross, Carter testified that there were several other contractors who worked in the area of the project and that Henningsen Steel was the general contractor and had control over the construction site.

The next witness was one Lawrence Hancock, who testified that he was employed by Royal Industries during the summer of 1974. Hancock stated that he was on the job site on the weekend of October 12, 1974, just before plaintiff sustained his injuries. He testified that there was some Belger Cartage equipment at the job site on that weekend but that he did not observe any Belger Cartage employees working on any machinery at that time. Hancock testified that he did observe a Belger Cartage half cab on the job site at that time.

Hancock further stated:

Q. (By plaintiff's counsel Reeser): Do you ever recall seeing a large press laying on the concrete pad?

A. No, I never seen it on a pad.

Q. You never did see it laying on its side or on its back? Excuse me?

A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you ever see the big press, 265 ton press?

A. Yes, when it was all set up.

Q. All right, did you ever see it sitting beside this press pit that Mr. Carter has testified about?

A. No.

Q. You never did see it sitting beside it?

A. No.

Q. Do you recall giving a statement on October 21, 1980, where you indicated— let me ask you if this refreshes your memory: "The Belger Cartage people set up on the concrete and put out their outriggers. They hooked up some cables to the big press—"

MR. GAEBLER: Your Honor, I'm going to object to opposing counsel's utilization of that exhibit and reading it into the record without any proper foundation.

THE COURT: The objection will be sustained.

MR. REESER: Your Honor, this will be —I'm refreshing the witness' recollection here to see if he remembers giving this statement.

THE COURT: From what?

MR. REESER: And this was exactly as you permitted—

THE COURT: From what, Mr. Reeser?

MR. REESER: From a statement that he signed.

THE COURT: Well, is it marked as an exhibit?

MR. REESER: Yes.

THE COURT: What is the number?

MR. REESER: Plaintiff's Exhibit 9

THE COURT: All right.

Q. (By Mr. Reeser): I hand you what has been marked Plaintiff's Exhibit 9 and ask you if that is your signature on there?

A. Yes.

Q. And is this statement that you gave stating that—and I'll read it verbatim. "They hooked up some cables to the big press—"

MR. GAEBLER: Your Honor, I would object at this time to counsel using an

exhibit that has not been received into evidence.

MR. REESER: I'm laying a foundation for it, Judge.

THE COURT: All right, as long as he's laying a foundation, he may proceed.

Q. (By Mr. Reeser) "—and moved the press over the press pit. The press did not fit the press pit because the mounting anchor bolts did not match up with the machine. The bolts were set in the concrete, and the bolts stuck up in the air. The holes in the machine wouldn't match. So the Belger Cartage people moved it off the pit and set it right next to the hole, just to the north of the hole. They unhooked and then took off, leaving the hole open. They did not put any barricades or plywood over the hole. A couple of days later I found out Herb Sewell had fallen in the hole the following Sunday night." Dated October 21, 1980. Now is that your statement that you gave at that time?

A. Yes.

MR. GAEBLER: At this time, Your Honor, I'm going to renew my objection that he's utilizing an exhibit without any proper foundation. That goes beyond laying a foundation for the exhibit. And further object to the utilization of that as an attempt to impeach his own witness.

MR. REESER: If I may respond, Your Honor, I just need to establish whether this is past memory recorded or present memory revived and I need to voir dire the witness to see which aspect this is, if I may.

THE COURT: Well, I'm going to sustain the objection as to impeaching your own witness.

MR. REESER: Oh, no. No, sir. This is past memory recorded, if I may.

THE COURT: For that very limited purpose, you may proceed.

Q. (By Mr. Reeser): Now, let me ask you, sir, after you—reading over your statement, does that—now can you remember those things happening, or do you need to refer to the statement as you testify?

A. It has been so long I just about forgot what it was, the exact date.

Q. Can you remember—let me take this away. Can you remember independently of your statement the details about what was—what we read here a minute ago in your statement? Can you remember that independently of that statement? Does it refresh your memory so that you can testify to it, or has it been so long ago that you can't remember? Which is it?

A. Well, it's been quite awhile but, yet—

Q. You have flashes?

A. What?

Q. You just have kind of flashes of it?

MR. GAEBLER: I object to the leading form of the question, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Reeser) Let me ask it this way: You have a statement here that you signed October 21, 1980.

MR. GAEBLER: I object to the leading form of the question.

THE COURT: Overruled.

The testimony continued with plaintiff's counsel attempting to lay foundation for recollection refreshed, and defense counsel objecting to the use of the statement on the ground that counsel was attempting to impeach his own witness.

At this point, the proceedings were recessed for lunch and counsel were called into chambers. Discussion commenced concerning further use of the statement. The court ruled that the statement could not be used to impeach the witness, and that the statement could not be used for past recollection recorded unless a proper foundation is laid. The court concluded the conference by stating that plaintiff could continue with Mr. Hancock to try to lay a foundation for the statement but that a proper foundation had not been laid at that time. When court reconvened, plaintiff called its next witness. The Hancock statement was not admitted into evidence.

Plaintiff next presented medical experts to testify as to plaintiff's alleged injuries.

As such testimony was not pertinent to the appeal, the parties stipulated that it not be set forth in the transcript, and such record is not before this court on this appeal.

The final witness for plaintiff was Hurbert Sewell (plaintiff and respondent herein). Plaintiff testified that he was employed by Royal Industries in March of 1974 as a foreman. In October of 1974, plaintiff was working the 11:00 p.m. to 7:00 a.m. shift. During that time, plaintiff would have occasion to be in the concrete pad area, but plaintiff stated that he never saw the press pit because there were materials and equipment stacked and stored on the concrete pad, but that he knew there was a press pit on the pad. Plaintiff testifed that during the late summer or early fall of 1974, he had observed Belger Cartage equipment at the project site. Plaintiff stated that on the day before the incident in question, he had finished work at 7:00 a.m. and at that time he observed a Belger Cartage truck on the project site.

Plaintiff testified that before October 13, 1974, he had seen the press, and that it was a large piece of equipment. Plaintiff stated that after he returned from work, two weeks following his injury, he observed a work order, dated October, 1974, that said Belger on it; that the work order was on the foreman's desk; and that when work is done over the weekend, the work order is laid on the foreman's desk before the order is processed through. Plaintiff testified that the Belger work order was regarding moving and setting up the press over the press pit.

As testimony continued, plaintiff stated that when he first observed the press, it was lying on its back on the concrete pad, and that it remained there for some two or three weeks. Plaintiff did not see who unloaded the press from the truck, nor did he see anyone move the press to its position on the pad or later set it up on its feet. Plaintiff was asked, "Did you actually ever see Belger Cartage set it (the press) up over the hole?" To this plaintiff responded, "No."

As to the alleged injury, plaintiff testified that on the evening of October 13, 1974, he arrived at work at 10:00, approximately one hour before he was to be on duty. Plaintiff met with one Marvin Brown, the foreman for the previous shift, and discussed the work to be done that evening. Brown told plaintiff that the press had been set up, and plaintiff testified that he interpreted that to mean that the press was upright on its legs and positioned over the press pit. Brown said, "Well, let's take a look at it."

The lighting on the area of the concrete pad was dim, the source of the light being two street lights in the area. Brown and plaintiff walked out onto the concrete pad, plaintiff a couple steps behind Brown and to the right. The men had to travel in a zig-zag pattern to navigate around the equipment and materials stacked on the concrete pad. Plaintiff testified that as he approached, he could see the large press in an upright position, facing south. Plaintiff testified that he was facing the front of the press and as he approached the machinery, he was looking up at the press when he stepped into the uncovered press pit and injured his knee.

On cross-examination, plaintiff admitted that his duties as foreman did not necessitate being on the concrete pad area, but that he walked out there the night of October 13, out of his own curiosity. Plaintiff stated that the lighting was dim and he knew the press pit was somewhere out on the pad, but that he did not take a flashlight with him. Plaintiff admitted that as he approached the press, he was looking up at it and the fact that there was a hole "flat slipped [his] mind." Plaintiff testified that the press was positioned so that it partially covered the pit by about one or two feet. The pit was covered subsequent to plaintiff's injury.

Finally, plaintiff testified that he did not see any Belger Cartage employees on the project site immediately before he arrived at work on October 13, 1974; he did not see any Belger Cartage employees working at the press pit; he did not see any Belger

Cartage employees moving the press; and he did not see any Belger Cartage employees cover or uncover the press pit.

Plaintiff's evidence closed and defendant moved for a directed verdict which the court took under advisement and subsequently overruled. After the close of all the evidence, defendant again moved for a directed verdict and such motion was overruled. The cause was submitted to the jury which returned a verdict, finding defendant 70% at fault and plaintiff 30% at fault. Defendant later filed a motion for judgment notwithstanding the verdict and in the alternative, a motion for new trial. Both motions were overruled and defendant filed this appeal.

Because of the disposition of appellant's point (1), this court does not reach or decide appellant's point (2). Under its point (1), appellant charges that the trial court erred in overruling its motions for directed verdicts, for judgment notwithstanding the verdict, and for new trial because the plaintiff (respondent) failed to make a submissible case.

The elements in an action for negligence are: existence of a duty on the part of defendant to protect plaintiff from injury, failure of defendant to perform that duty, and injury to the plaintiff resulting from such failure; the last element includes the question of proximate cause. *Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881, 886 (Mo. banc 1983); *St. John Bank & Trust Co. v. City of St. John*, 679 S.W.2d 399, 401 (Mo.App.1984), and *Dix v. Motor Market, Inc.*, 540 S.W.2d 927, 932 (Mo.App. 1986).

On review of evidence to determine whether appellant's Motions for Directed Verdict should have been sustained, this court is bound to view the evidence in the light most favorable to respondent. *See Rustici v. Weidemeyer*, 673 S.W.2d 762, 765 (Mo. banc 1984), *National Garment Co. v. City of Paris*, 655 S.W.2d 515, 516 (Mo. banc 1983) and *Delisi v. St. Luke's Episcopal-Presbyterian Hospital, Inc.*, 701 S.W.2d 170, 173 (Mo.App.1985).

Plaintiff's evidence was wholly devoid of any testimony establishing that defendant uncovered and left open the press pit into which plaintiff fell. Wayne Carter testified that he did not see who moved the press over to the press pit area, but that he had only seen Haggard Hauling & Rigging deliver and unload the press. When Lawrence Hancock testified, he stated that he did not see the press lying on the pad, nor did he see it sitting beside the press pit. Although plaintiff attempted to refresh the witness' memory as to whether he (the witness) had seen Belger Cartage set up the press next to the press pit, the court ruled that plaintiff had failed to lay a proper foundation for the use of the statement, and the statement was never admitted into evidence. Plaintiff failed to object to the exclusion of the statement. In determining whether plaintiff has made a submissible case of negligence, a reviewing court will not consider evidence which the trial court either struck out or rejected. It will consider evidence which is favorable to plaintiff as true and give plaintiff the benefit of every inference of fact which can reasonably be drawn therefrom, but in so doing, the reviewing court can neither supply evidence nor use such rule as a basis for unreasonable speculative or forced inferences. *Atcheson v. Braniff International Airways*, 327 S.W.2d 112, 117 (Mo. 1959).

Plaintiff argues that since a portion of the statement was read into the record in the presence and hearing of the jury, that portion of the statement was in evidence. A quick review of the testimony establishes that the trial court allowed plaintiff to read that portion of the statement, over the objections of defendant, for the very limited purpose of attempting to lay a foundation. The court subsequently ruled that a foundation had not been laid and that the statement was not in evidence. During an in-chambers conference before arguments, the court stated:

THE COURT: Well, I agree that that [the statement] is not an exhibit in this case. It is not evidence and you [Mr.

Reeser] cannot read from it. And I'm not going to permit you to read from it. It is not in evidence. And for you to get up there and read this statement to the jury would be to negate the defendant's objections which were sustained. That thing was never admitted in evidence and for you now to get up there and read it as if it were in evidence would be ludicrous.

Plaintiff also argues that the statement was substantive evidence because a prior inconsistent statement can be used for substantive purposes where the declarant is available for cross-examination, citing *Rowe v. Farmers Insurance Co.*, 699 S.W.2d 423 (Mo. banc 1985). In *Rowe*, the Missouri Supreme Court held that a prior inconsistent statement may be used to impeach one's own witness, and that the statement may be considered as substantive evidence. On appeal, plaintiff argues that the statement was substantive evidence under the rule stated in *Rowe*. During trial, however, plaintiff's counsel consistently maintained that he was not impeaching his witness:

MR. REESER: (During conference in chambers): Judge, it's kind of a combination situation. It strikes me as being someone who has some memory but not total recall of the situation. So I'm offering it, and it surprised me that he couldn't remember the whole thing, so on that basis, I am surprised. Now—but I don't want to impeach him. I am not offering it for impeachment, I'm offering it as past memory recorded because he hasn't really stated anything different from the statement. He's stating, "I can't remember." This has been ten years ago, and the statement was five years ago and so on, as counsel has stated several times today, memories are frail.

Plaintiff's counsel denied that he was offering the statement for the purpose of impeachment, but for past memory recorded, and having adopted that theory below, he cannot now complain that the statement should have been admitted for impeachment. *See Cheek v. Weiss*, 615 S.W.2d 453, 456 (Mo.App.1981); and *Phillips Pipe Line Company v. Ashley*, 605 S.W.2d 514, 518 (Mo.App.1980). Furthermore, as pointed out *supra*, plaintiff did not preserve anything for review.

This court holds that the entire statement, which was never admitted into evidence, cannot be considered in a determination of the sufficiency of the evidence, nor can that portion of the statement which counsel read in an unsuccessful attempt to lay a foundation be considered as evidence.

At best, plaintiff's case was on the theory or res ipsa loquitur. In a res ipsa loquitur case, plaintiff establishes defendant's negligence by showing the occurrence of the accident which would not ordinarily happen in the absence of negligence, and that defendant had control of or the right and duty of control of the instrumentality causing the injury. *See Furlong v. Stokes*, 427 S.W.2d 513, 517 (Mo.1968) and *Parlow v. Dan Hamm Drayage Co.*, 391 S.W.2d 315, 321–22 (Mo.1965). In the present case, plaintiff's own testimony demonstrates the res ipsa loquitur nature of the case:

Q. (By Mr. Gaebler) Lest there be any confusion, Mr. Sewell, it is not your testimony that Belger Cartage failed to cover that hole?

A. It is my testimony that they failed to cover that hole.

Q. The did fail—

A. They were the last ones at the location before I arrived Sunday night.

Q. Now, Mr. Sewell, you did not see them on that occasion immediately before you arrived at work, did you?

A. I did not.

Q. You did not see them working at that press pit?

A. No.

Q. You did not see them moving that press in relationship to that hole, wheth-

er it's next to, partially covering the hole, or taking any action towards that press pit, did you?

A. No.

Q. You did not see Belger Cartage uncover that hole?

A. No.

Q. You did not see Belger Cartage recover that hole?

A. It was definitely open when I stepped onto it. It wasn't recovered.

Q. And you didn't see Belger Cartage make that hole to be open and uncovered?

A. No.

The evidence failed to establish by direct and specific evidence that defendant uncovered and left open the press pit into which plaintiff fell. Therefore, to prove defendant's negligence, plaintiff must have established that defendant had control of or the right and duty of control of the press pit. *See Furlong v. Stokes, supra.* The record is totally lacking of such proof.

Plaintiff's witness Hancock testified that he observed a Belger Cartage half cab on the job site the weekend of plaintiff's injury but that he had never seen the press until it had been set up over the press pit.

Finally, plaintiff testified that he had not seen Belger Cartage working at the press pit or moving the press itself, but he stated that he had seen, two weeks *after* the accident, a work order from Belger Cartage concerning the movement of the press. Plaintiff, however, could not testify as to the date on the work order except that it was in October of 1974. Even viewed in the light most favorable to plaintiff, the testimony failed to establish that defendant had control of the press pit area just prior to the accident.

The trial court erred in overruling defendant's motions for directed verdict and allowing the cause to be submitted to the jury. The judgment is reversed and the cause is remanded with directions to the circuit court to enter judgment to appellant's favor.

All concur.